# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
October 2, 2008 Session Heard at Nashville[1]

## CHERYL BROWN GIGGERS ET AL. v. MEMPHIS HOUSING AUTHORITY ET AL.

**Appeal by Permission from the Court of Appeals**
**Circuit Court for Shelby County**
**No. CT-000896-03     Kay S. Robilio, Judge**

---

**No. W2006-00304-SC-R11-CV – Filed February 3, 2009**

---

The plaintiffs, survivors of a tenant shot and killed by the criminal act of another tenant, filed suit against the defendant housing authority, alleging negligence and breach of contract for failure to provide a safe premises. The trial court granted summary judgment in favor of the housing authority and the Court of Appeals affirmed. We granted review to determine whether the housing authority owed a duty of care, an essential component of the claim, under the theory of negligence. Because the potential for violence in the housing project was reasonably foreseeable and the gravity of the harm outweighed the burden on the housing authority to have taken reasonable protective measures, the judgment is reversed and the cause is remanded to the trial court for further proceedings.

**Tenn. R. App. P. 11; Judgment of the Court of Appeals Reversed**
**and Case Remanded to the Circuit Court for Shelby County**

GARY R. WADE, J., delivered the opinion of the court, in which CORNELIA A. CLARK and WILLIAM C. KOCH, JR., JJ., and E. RILEY ANDERSON, SP.J., joined. JANICE M. HOLDER, C.J., filed a concurring and dissenting opinion.

Archie Sanders, III, Memphis, Tennessee, for the appellant, Cheryl Brown Giggers, Angela G. Brown, Charles C. Brown, and JoAnn Fisher.

Charles Wesley Fowler, Memphis, Tennessee, for the appellee, Memphis Housing Authority and, Joe Lee Wyatt and William Joseph Wyatt, Memphis, Tennessee, for the appellee, Scruggs Security and Patrol, LLC.

Timothy David Patterson, Memphis, Tennessee, for the Amicus Curiae, Pacific Legal Foundation.

---

[1] Oral argument was heard at the Davidson County Drug Court IV in Nashville, Tennessee, as a part of this Court's **S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents (S.C.A.L.E.S.) project.

**OPINION**

On March 7, 2002, at approximately 11:45 a.m., L.C. Miller, a tenant in Jefferson Square, one of several public housing projects owned by the Memphis Housing Authority ("MHA"), argued with the housing project's security guard, fired shots in the direction of his office, and struck and killed Charles Cornelius Brown, Sr., another tenant at the facility who happened to be in the office area at that time. Brown was not involved in the argument. Miller was subsequently shot by the security guard, who was an employee of Scruggs Security and Patrol, LLC ("Scruggs"), a private company which provided security at the facility at the time of the shooting.[2]

**Procedural History and Facts**

On February 18, 2003, Cheryl Brown Giggers, Charles C. Brown, Jr., and Angela G. Brown, Brown's surviving children, and Joann Fisher, his sister, (the "Plaintiffs") filed a wrongful death suit against the City of Memphis (the "City") and MHA, alleging both negligence and breach of contract. The Plaintiffs contended that the City and MHA were negligent in several ways: by failing to adequately investigate Miller's background prior to allowing him to lease a unit in the high rise Jefferson Square Apartments; by failing to enforce internal policies which would have affected Miller's status as a tenant; by allowing Miller to possess a rifle on the premises; and by failing to properly assess the risk Miller presented to the other tenants on the property. The Plaintiffs also asserted that the City and MHA had breached a contractual obligation within their lease agreement by failing to maintain a safe premises.

Upon motion, the trial court dismissed the City as a defendant and the Plaintiffs amended the complaint, naming MHA as the sole defendant. After MHA filed an answer, the Plaintiffs amended the complaint a second time, adding Scruggs as a defendant. Scruggs filed a cross-claim against MHA, alleging negligence in the investigation of Miller's background prior to allowing him to rent an apartment within the project. Scruggs also sought indemnity pursuant to a provision in its contract with MHA. In turn, MHA filed a cross-claim, asserting that Scruggs was vicariously liable for the negligent acts of its security guard and seeking indemnity pursuant to their contract. Later, MHA filed a motion to dismiss the original complaint and, in the alternative, sought summary judgment as to the Plaintiffs' claims.

A concise statement of the pertinent facts appears in the pleadings and in the supplemental documentation in the record. When Miller filed an application to reside in the apartment complex in 1996, MHA investigated his credit history and performed a home visit. It was the responsibility of MHA's department of security to conduct background checks for prospective tenants.[3] Howard Terry, who had served as an MHA employee since 1994 but as the department head only since 2000,

---

[2] In 1998, when Miller had an altercation with another tenant, James Tiplett, a different security company was under contract with MHA.

[3] In 1996, MHA did background checks through the Sheriff's Department only on new tenants. After the shooting, MHA was authorized to use the National Crime Information Center (NCIC) not only for new tenants but also for re-certification purposes.

administered security for Jefferson Square and three other high rise buildings at the time this suit was filed. As a part of his responsibilities, he directed investigations and received reports of any incidents on the various premises that relate to security. Records in Terry's office indicated that on January 27, 1996, MHA asked the Sheriff's Department to conduct a background check on Miller. The investigation, which extended over the three years prior to the application, did not "uncover information that prohibit[ed] his . . . being housed . . . pursuant to MHA admission policies."

On May 8, 1998, well after Miller had taken occupancy of an apartment unit, he inflicted a pocket knife wound upon another tenant after a verbal exchange. A report filed with MHA indicated that Miller, agitated by James Tiplett, who was another tenant at the apartments, threatened to kill Tiplett unless he "stop[ped] singing in my ear." Shortly thereafter, Miller "jumped out of some bushes swinging a knife, scratching [Tiplett] on the arm." The report established that Tiplett refused medical treatment and that he originally declined to press charges, but did so afterwards when Miller continued to make verbal threats. Miller was arrested for aggravated assault as a result of the incident and a second report was filed by MHA. While the ultimate disposition on the criminal charge is not a part of the record, MHA placed Miller on probationary status for one year, warning that future violations would be basis for a termination of his lease. When questioned during a pre-trial deposition, Terry professed that he had no recollection of the 1998 incident but he did acknowledge that MHA had a "one-strike" policy in effect at that time, calling for eviction for the first instance of disruptive behavior. He explained that Derwin Jackson, the operations manager for MHA, had the responsibility of determining whether to evict based upon the report filed. Jackson served in that position in 1998 but left in 2000, some two years before the shooting incident. The following exchange took place during the course of the Terry deposition:

Q. From a security perspective, if you know we have a tenant who has assaulted another tenant with a knife, do you believe from a security perspective it is a good idea for that tenant who assaulted the other tenant to remain a tenant on the property or should that tenant's lease be terminated?
A. The tenant's lease should be terminated.

In response to the motion for summary judgment by MHA, the Plaintiffs submitted exhibits establishing that Miller had been charged with aggravated assault in 1979 and, in 1977, had pled guilty to firing a weapon within the city limits. There was no indication that MHA was aware of either incident. Further, the Plaintiffs also provided documentation of the 1998 altercation that resulted in the charge of aggravated assault against Miller. They also alleged that there had been between ten and twenty shooting incidents on the various MHA properties and numerous other assaults prior to the May 7, 2002 murder of Charles Cornelius Brown, Sr. Based upon the 1998 incident, the Plaintiffs argued that MHA had notice of Miller's propensity for violence and reiterated their contention that MHA had failed to maintain a safe premises. They asserted that MHA had failed to observe its own internal policies which were designed to prevent violence on the part of its tenants.

The trial court held that neither the internal policies of MHA nor the contents of the criminal background check of Miller created any duty to the Plaintiffs under these circumstances. Moreover, after observing that a policy excluding those with prior records would result in "a massive underclass of ex-convicts homeless due to an inability to find housing," the trial court rejected the Plaintiffs' argument that there was an affirmative duty on the part of MHA to conduct a criminal background check on prospective residents. Finally, the trial court held that the Plaintiffs were not entitled to recover as third party beneficiaries for breach of the terms of the lease agreement between MHA and Miller.

On direct appeal, the Plaintiffs argued that because MHA had some awareness of Miller's propensity for violence and, therefore, had a duty to take reasonable steps to maintain a safe premises, the trial court erred by dismissing the alternative theories of recovery in tort and by contract. Based upon MHA's prior knowledge of Miller's violent behavior, the Plaintiffs contended that MHA had a duty to monitor his actions or evict him from the premises.

The Court of Appeals affirmed the grant of summary judgment in favor of MHA, holding that "an isolated violent outburst by . . . Miller was [in]sufficient to notify MHA that criminal acts against its tenants were reasonably foreseeable, either generally or at some particular time" and, in consequence, insufficient to give rise to a duty in these circumstances. Giggers v. Memphis Hous. Auth., No. W2006-00304-COA-R3-CV, 2007 WL 2216553, at *11 (Tenn. Ct. App. Aug. 3, 2007). The Court of Appeals further held that a landlord has no affirmative duty to evict or closely monitor a tenant who is known to have a criminal history. Id. at *12. Considering the foreseeability and the gravity of the harm against the commensurate burden imposed on the landlord to provide protections against that harm, our intermediate court held generally, without specifically addressing the factors making up the balancing test, that public policy considerations weighed against the imposition of any duty. Id. Our Court of Appeals also considered the lease provision requiring MHA to "maintain the dwelling unit and development in decent, safe and sanitary condition" as a separate basis for liability, ruling that the language merely obligated the landlord to maintain the property so that the apartments and common areas were free from physical defects and concluding that the general rules of contract interpretation "did not contemplate protection of [tenants] from harm by third persons." Id. at *12-13 (quoting Archer v. Burton Plaza Assocs., Ltd., No. 03A01-9511-CV-00417, 1996 WL 93584, at *2 (Tenn. Ct. App. Mar. 4, 1996)).

We granted the application for permission to appeal to consider the propriety of the negligence claim and specifically whether MHA, having knowledge of Miller's prior act of violence at the apartments, owed a duty to Charles Cornelius Brown, Sr.

**Standard of Review**

The scope of review of a grant of summary judgment is well established. Because our inquiry involves a question of law, no presumption of correctness attaches to the judgment, and our task is to review the record to determine whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. Hunter v. Brown, 955 S.W.2d 49, 50-51 (Tenn. 1997); Cowden v. Sovran Bank/Cent. S., 816 S.W.2d 741, 744 (Tenn. 1991).

-4-

A summary judgment may be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; Byrd v. Hall, 847 S.W.2d 208, 214 (Tenn. 1993). The party seeking the summary judgment has the ultimate burden of persuasion "that there are no disputed, material facts creating a genuine issue for trial . . . and that he is entitled to judgment as a matter of law." Id. at 215. If that motion is properly supported, the burden to establish a genuine issue of material fact shifts to the non-moving party. In order to shift the burden, the movant must either affirmatively negate an essential element of the nonmovant's claim or demonstrate that the nonmoving party cannot establish an essential element of his case. Id. at 215 n.5; Hannan v. Altell Publ'g Co., 270 S.W.3d 1, 8-9 (Tenn. 2008). "[C]onclusory assertion[s]" are not sufficient to shift the burden to the non-moving party. Byrd, 847 S.W.2d at 215; see also Blanchard v. Kellum, 975 S.W.2d 522, 525 (Tenn. 1998). Our state does not apply the federal standard for summary judgment. The standard established in McCarley v. West Quality Food Service., 960 S.W.2d 585, 588 (Tenn. 1998), sets out, in the words of one authority, "a reasonable, predictable summary judgment jurisprudence for our state." Judy M. Cornett, The Legacy of Byrd v. Hall: Gossiping About Summary Judgment in Tennessee, 69 Tenn. L. Rev. 175, 220 (2001).

Courts must view the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. Robinson v. Omer, 952 S.W.2d 423, 426 (Tenn. 1997). A grant of summary judgment is appropriate only when the facts and the reasonable inferences from those facts would permit a reasonable person to reach only one conclusion. Staples v. CBL & Assocs., Inc., 15 S.W.3d 83, 89 (Tenn. 2000). In making that assessment, this Court must discard all countervailing evidence. Byrd, 847 S.W.2d at 210-11. Recently, this Court confirmed these principles in Hannan.

**Applicable Law in Negligence Suits**

Our Court of Appeals accurately assessed the applicable law. In order to establish a prima facie claim of negligence, basically defined as the failure to exercise reasonable care, a plaintiff must establish the following essential elements: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." McCall v. Wilder, 913 S.W.2d 150, 153 (Tenn. 1995); see also Naifeh v. Valley Forge Life Ins. Co., 204 S.W.3d 758, 771 (Tenn. 2006). The first element, that of duty, and the dispositive issue in this case, is the legal obligation of a defendant to conform to a reasonable person's standard of care in order to protect against unreasonable risks of harm. Burroughs v. Magee, 118 S.W.3d 323, 328-29 (Tenn. 2003); McClung v. Delta Square Ltd. P'ship., 937 S.W.2d 891, 894 (Tenn. 1996). In general, an individual has a duty to others to refrain from engaging in misfeasance, affirmative acts that a reasonable person "should recognize as involving an unreasonable risk of causing an invasion of an interest of another" or acts "which involve[] an unreasonable risk of harm to another." Restatement (Second) of Torts §§ 284, 302 (1965). Under our common law, however, courts were reluctant to impose liability for nonfeasance, a course of inaction, as opposed to an act risking harm to others. W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 56, at 373 (5th ed. 1984). As a means of mitigating the harshness of the common law rule, exceptions have been created for circumstances in which the defendant has

a special relationship with either the individual who is the source of the danger or the person who is at risk. Lindsey v. Miami Dev. Corp., 689 S.W.2d 856, 860 (Tenn. 1985). In Cornpropst v. Sloan, 528 S.W.2d 188 (Tenn. 1975), for example, this Court made the following observation:

> At common law, a private person or corporation, as distinguished from governmental units, had no duty whatsoever to protect others from the criminal acts of third parties. That general rule has remained steadfast in the tort law of this country, despite the exceptions that have appeared from time-to-time, where special relationships and special circumstances have combined to impose liability.

Id. at 191. The relationship between a landlord and a tenant is one of those relationships deemed special, placing an obligation on landlords to use reasonable care to protect tenants against unreasonable risk of foreseeable harm. See Speaker v. Cates Co., 879 S.W.2d 811, 814-15 (Tenn. 1994); Tedder v. Raskin, 728 S.W.2d 343, 347 (Tenn. Ct. App. 1987); cf. Doe v. Linder Constr. Co., 845 S.W.2d 173, 177-78 (Tenn. 1992); Biscan v. Brown, 160 S.W.3d 462, 478-79 (Tenn. 2005). This relationship creates an affirmative charge to either control the source of the danger or to protect an endangered tenant. See Restatement (Second) of Torts §§ 314A(1)(a), 314A(2) & 315(b). Thus, a landlord, while not an insurer, owes a tenant the duty "to take reasonable precautions to protect [his or her] tenants from criminal acts of third parties on the leased premises," among other foreseeable dangers. Tedder, 728 S.W.2d at 347; see also Linder Constr. Co., 845 S.W.2d at 177-78.

Traditionally, the question of whether a defendant owes a duty of care to the plaintiff is a question of law to be determined by the courts. West v. E. Tenn. Pioneer Oil Co., 172 S.W.3d 545, 550 (Tenn. 2005) ("Although not a part of the early English common law, the concept of duty has become an essential element in all negligence claims," as well as a question of law for the courts); Pittman v. Upjohn Co., 890 S.W.2d 425, 428 (Tenn. 1994); Glenn v. Conner, 533 S.W.2d 297, 302 (Tenn. 1976). In its determination of the legal issue, "[a] decision by the court that, upon any version of the facts, there is no duty, must necessarily result in judgment for the defendant. A decision that if certain facts are found to be true, a duty exists, leaves open the other questions [as to the presence of negligence]." Lindsey, 689 S.W.2d at 859 (quoting Prosser, § 37 at 236). In McCall, we held that "[a] risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." McCall, 913 S.W.2d at 153. "[T]he imposition of a legal duty reflects society's contemporary policies and social requirements concerning the right of individuals and the general public to be protected from another's act or conduct." Bradshaw v. Daniel, 854 S.W.2d 865, 870 (Tenn. 1993). In McClung, under circumstances comparable to these, this Court "impose[d] a duty upon businesses to take reasonable measures to protect their customers from foreseeable criminal attacks." McClung, 937 S.W.2d at 899.

In order to determine whether a duty is owed in a particular circumstance, courts must first establish that the risk is foreseeable, and, if so, must then apply a balancing test based upon principles of fairness to identify whether the risk was unreasonable. Satterfield v. Breeding

Insulation Co., 266 S.W.3d 347, 366 (Tenn. 2008). That is, in consideration of, among other things, the presence or absence of prior similar incidents, and other circumstances, does the foreseeability of the harm outweigh the burden of the duty imposed? McClung, 937 S.W.2d at 901. In Downs ex rel. Downs v. Bush, 263 S.W.3d 812, 820 (Tenn. 2008), we held as follows:

> The foreseeability of the harm is a key factor in the equation because, in general terms, "[f]oreseeability is the test of negligence." West, 172 S.W.3d at 552 (quoting Linder Constr. Co., 845 S.W.2d at 178); Hale v. Ostrow, 166 S.W.3d 713, 716-17 (Tenn. 2005). "'A risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable.'" West, 172 S.W.3d at 551 (quoting Linder Constr. Co., 845 S.W.2d at 178). However, foreseeability alone does not create a duty to exercise reasonable care. McClung, 937 S.W.2d at 904. If the risk is foreseeable, then courts should weigh the remaining factors to determine if an imposition of duty is justified.

Although no duty will arise when a risk of injury is not generally foreseeable, foreseeability alone "is not, in and of itself, sufficient to create a duty." Satterfield, 266 S.W.3d at 366. Rather, when a minimum threshold of foreseeability is established, courts must engage in "an analysis of the relevant public policy considerations," id. at 364-65, to determine whether a duty enforceable in tort must be imposed. While not exclusive, the factors are as follows:

> [T]he foreseeable probability of the harm or injury occurring; the possible magnitude of the potential harm or injury; the importance or social value of the activity engaged in by defendant; the usefulness of the conduct to defendant; the feasibility of alternative, safer conduct and the relative costs and burdens associated with that conduct; the relative usefulness of the safer conduct; and the relative safety of alternative conduct.

McCall, 913 S.W.2d at 153. See also Burroughs, 118 S.W.3d at 329.

When and if the trial court determines that the foreseeability of the harm and its particular gravity outweigh the burden of taking reasonable protective measures, the question "of duty and of whether defendants have breached that duty . . . is one for the jury to determine based upon proof presented at trial." McClung, 937 S.W.2d at 904. As previously stated, whether a defendant owed a duty of care is a question of law for the court to decide. West, 172 S.W.3d at 550; Stewart v. State, 33 S.W.3d 785, 793 (Tenn. 2000). Nevertheless, courts should take precautions to avoid any invasion of the province of the jury. Satterfield, 266 S.W.3d at 367-68.

**Analysis**

Recently, in Satterfield, we determined that a family member of an employee who was exposed to asbestos at his workplace fell within a class of individuals who an employer, in the light most favorable to the validity of the claim, could have reasonably foreseen would be harmed by the

exposure.  Id. at 367.  Also, in Downs, we held that the driver and passengers of a vehicle might reasonably have foreseen a risk of harm to an intoxicated passenger whom they allegedly placed in the bed of a pickup truck.  Downs, 263 S.W.3d at 821.  In each of these opinions, we described foreseeability as particularly important, paramount to the analysis of duty.  See Hale, 166 S.W.3d at 716-17.  In those cases, we acknowledged that consideration of the issue first required a determination as to whether "a reasonable person could foresee the probability of its occurrence or . . . was on notice that the likelihood of danger to the party to whom is owed a duty is probable."  West, 172 S.W.3d at 550 (quoting Linder Constr. Co., 845 S.W.2d at 178).  "Foreseeability must be determined as of the time of the acts or omissions claimed to be negligent."  Linder Constr. Co., 845 S.W.2d at 178.

As noted, the landlord and tenant qualify as having a special relationship.  Further, violence in a housing project is, generally speaking, foreseeable.  Poverty is common in such areas.[4]  In consequence, precautions are warranted.  The record establishes that MHA, aware of this potential danger, took some measures to guard against violence.  In 1996, criminal background checks extending over a period of three years, a credit history report, and a home visit were warranted for a variety of reasons, including safety.  The question, of course, is whether MHA, with some general knowledge of criminal activity within its housing complexes and a particular knowledge of Miller's altercation with another tenant four years earlier, could have reasonably foreseen the probability of a violent act.  We think so.  Indeed, the risk of violent attack at a housing project is nothing new.  See, e.g., Dailey v. Hous. Auth. for Birmingham Dist., 639 So.2d 1343, 1343-44 (Ala. 1994) (housing project tenant killed by stray bullet from gunfight while standing on her porch); Williams v. N.Y. City Hous. Auth.,  867 N.Y.S.2d 442, 443 (N.Y. App. Div. 2008) (tenant shot while talking to friend in outdoor common area of public housing complex); Smith v. Howard, 489 So.2d 1037, 1037-38 (La. Ct. App. 1986) (decedent shot and killed by housing project tenant about whom other tenants had previously complained).  The potential for violence in the Jefferson Square Apartments was, therefore, generally foreseeable by the landlord.  Under our law, of course, it is only when the injury is not foreseeable that a criminal act by a third party constitutes "a superseding, intervening cause of the harm, relieving the landlord of liability."  Linder Constr. Co., 845 S.W.2d at 178 (quoting Tedder, 728 S.W.2d at 349).

Because of competing social concerns, the application of the balancing test to determine whether a duty existed presents a particularly difficult question in this instance.  Miller, some four years prior to the shooting, had assaulted another tenant with a pocket knife and was charged with felony assault.  These events were documented by MHA and presented a recognizable, potential risk

<hr>

[4]  Tom Jones, The Audacity of Hope?, Memphis Magazine, Oct. 1, 2008, available at http://www.memphismagazine.com/gyrobase/Magazine/Content?oid=oid%3A51019 (last visited Dec. 30, 2008).  This article estimated that 162,000 Memphians live in poverty (the equivalent of the entire population of Chattanooga).  It suggests that the percentage of youths under eighteen living in poverty, the statistic most pertinent to crime rates, is 42%.

to other tenants within the facility.[5]  That MHA was aware of Miller's conduct establishes a prima facie case of specific foreseeability, the first factor in the balancing test.  The second factor, the possible magnitude of the harm, also supports the existence of a duty on the part of MHA.  A violent act by the use of a weapon obviously presents a risk of significant injury.  Armed with a rifle, Miller fired a shot which proved to be fatal to another tenant who just happened to be in the security office area at the time.

The third factor in the balancing test favors MHA.  Initially, a public housing facility is designed to provide affordable housing to low income tenants.[6]  The

---

[5] In Williams v. Gorman, 520 A.2d 761, 765 (N.J. Super. Ct. App. Div. 1986), the court ruled that there was no duty to evict when the violent tendencies of a tenant who fired a shotgun into the victim's adjoining unit were unknown to the landlord.

[6] The Section 8 housing and voucher program, under which the federal government provides subsidies to local public housing agencies in an effort to improve living conditions for low-income families, was created by the Housing Act of 1937, also known as the Wagner-Steagall Act.  The 1937 Act included the following "Declaration of Policy":

> It is hereby declared to be the policy of the United States to promote the general welfare of the Nation by employing its funds and credit, as provided in this Act, to assist the several States and their political subdivisions to alleviate present and recurring unemployment and to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in rural or urban communities, that are injurious to the health, safety, and morals of the citizens of the Nation.

Wagner-Steagall Housing Act, ch. 896, § 1, 50 Stat. 888, 888 (1937) (current version at 42 U.S.C. § 1437(a) (2006)).

The Quality Housing and Work Responsibility Act of 1998 (QHWRA) was an effort to reform public housing and the federal Section 8 voucher formula.  Section 505 of the QHWRA (P.L. 105-276) amended the policy directive section of the 1937 Act significantly.  As a result of the QHWRA amendments, that section currently reads:

It is the policy of the United States--

(1) to promote the general welfare of the Nation by employing the funds and credit of the Nation, as provided in this chapter--

> (A) to assist States and political subdivisions of States to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families;

> (B) to assist States and political subdivisions of States to address the shortage of housing affordable to low-income families; and

> (C) consistent with the objectives of this subchapter, to vest in public housing agencies that perform well, the maximum amount of responsibility and flexibility in program administration, with appropriate accountability to public housing residents, localities, and the general public;

(2) that the Federal Government cannot through its direct action alone provide for the housing of every

(continued...)

importance of the social value of affordable public housing in Tennessee cannot be overstated. Figures from the United States Census Bureau indicate that in 2007, over 900,000 Tennesseans, or nearly 15 percent of the state's population, subsisted at or below the federal poverty guidelines.[7] Shelby County is the largest of the ninety-five counties in Tennessee, and its largest city, Memphis, is the most populated city in the state and the 18th-largest in the nation.[8]  Public housing is

---

[6](...continued)
American citizen, or even a majority of its citizens, but it is the responsibility of the Government to promote and protect the independent and collective actions of private citizens to develop housing and strengthen their own neighborhoods;

(3) that the Federal Government should act where there is a serious need that private citizens or groups cannot or are not addressing responsibly; and

(4) that our Nation should promote the goal of providing decent and affordable housing for all citizens through the efforts and encouragement of Federal, State, and local governments, and by the independent and collective actions of private citizens, organizations, and the private sector.

42 U.S.C. § 1437(a).

The Hope VI block grant program was created in 1992 as part of P.L. 102-389.  Its "Purposes" section also was revised by the QHWRA, specifically Section 535 of that Act:

The purpose of this section is to provide assistance to public housing agencies for the purposes of--

(1) improving the living environment for public housing residents of severely distressed public housing projects through the demolition, rehabilitation, reconfiguration, or replacement of obsolete public housing projects (or portions thereof);

(2) revitalizing sites (including remaining public housing dwelling units) on which such public housing projects are located and contributing to the improvement of the surrounding neighborhood;

(3) providing housing that will avoid or decrease the concentration of very low-income families; and

(4) building sustainable communities.

It is also the purpose of this section to provide assistance to smaller communities for the purpose of facilitating the development of affordable housing for low-income families that is undertaken in connection with a main street revitalization or redevelopment project in such communities.

42 U.S.C. § 1437v(a) (2006).

[7] U.S. Census Bureau, Current Population Survey (CPS), Annual Social and Economic (ASEC) Supplement, Poverty Status by State: 2007, http://pubdb3.census.gov/macro/032008/pov/new46_100125_01.htm (last visited Dec. 30, 2008).

[8]  See http://www.tennessee.gov/tacir/County_Profile/shelby_profile.htm (last visited Dec. 30, 2008); http://www.census.gov/popest/cities/tables/SUB-EST2007-01.csv (last visited Dec. 30, 2008).  The September 27, 2007

(continued...)

particularly useful as a tool to alleviate a growing population of homeless people.[9] There is much truth in the trial judge's observation that the exclusion of those with prior records of criminal conduct from federal housing would create a "massive underclass [of the] . . . homeless."

MHA operated Jefferson Square Apartments pursuant to its authorization under Tennessee's Housing Authorities Law, Tennessee Code Annotated sections 13-20-101, et seq., which grants broad powers for furthering the public purpose of providing affordable housing to Tennesseans. The value of this service extends to the provision of affordable housing to individuals with some history of misconduct. As President George W. Bush explained in the last State of the Union address of his first term: "This year, some 600,000 inmates will be released from prison back into society. We know from long experience that if they can't find work, or a home, or help, they are much more likely to commit crime and return to prison. . . . America is the land of second chance, and when the gates of the prison open, the path ahead should lead to a better life." George W. Bush, State of the Union Address (Jan. 20, 2004), available at http://www.whitehouse.gov/news/releases/2004/01/20040120-7.html (last visited Jan. 6, 2009). According to the Bureau of Justice Statistics, 2,807 prisoners were released from state prison in Shelby County in 2001, including 916 violent offenders – the 24th highest release number and 22nd highest violent release numbers, respectively, among all the counties in the 37 states for which data was available (by comparison, Davidson County had 1,911 releases and 588 violent releases, ranking within the top 40 in both categories). U.S. Department of Justice, Bureau of Justice Statistics, Reentry Trends in The United States (2004), available at http://www.ojp.usdoj.gov/bjs/reentry/tables/countytab.htm (last visited Dec. 22, 2008). Thus, in addition to serving the public by providing affordable housing generally, housing authorities often provide appropriate housing opportunities to those individuals who face the task of reintegrating into society.[10] In short, the third factor weighs heavily in favor of MHA.

---

[8](...continued)
headline in the Memphis Commercial Appeal was "Memphis Leads U.S. in Violent Crimes." Hanna Rosin, American Murder Mystery, The Atlantic, Jul./Aug. 2008, available at http://www.theatlantic.com/doc/200807/memphis-crime.

[9] In August of 2002, it was estimated that 2,000 individuals in Shelby County were without a residence on any given night, and that 7,000 people were homeless for some period of time during 2001. Memphis/Shelby County Mayors' Task Force of Homelessness, Blueprint to Break the Cycle of Homelessness and Prevent Future Homelessness, August 2002, at 2, available at http://www.ich.gov/slocal/plans/memphis.pdf (last visited Jan. 6, 2009). On January 10, 2007, the Tennessean reported a homeless population of 1,542 in Nashville. Michael Cass, Homeless Count Finds 1,542 in Nashville, Tennessean (Nashville,TN), Jan. 10, 2007, at 1B. Furthermore, the U.S. Department of Housing and Urban Development estimated that, in 2005, some 5.99 million renter households nationwide have worst case housing needs, defined as having no greater than 50% area median income, not receiving housing assistance, and either paying at least 50% of their income for housing or living in severely inadequate housing. Office of Policy Development and Research, Department of Housing and Urban Development, Affordable Housing Needs 2005: Report to Congress 11 (2007), available at http://www.huduser.org/Publications/pdf/AffHsgNeeds.pdf (last visited Jan. 6, 2009).

[10] In Miller v. Whitworth, 455 S.E.2d 821, 827 (W. Va. 1995), the West Virginia Supreme Court observed that

the economic impact on landlords of housing in high crime areas could be quite severe if known

(continued...)

The fourth factor, the usefulness of stricter, alternative conduct, is neutral. While more careful scrutiny of potential tenants might serve to limit the risks of harm to current tenants, enforcing a more aggressive policy of identifying and excluding potentially dangerous tenants would force MHA to deny housing to some individuals who present indications of future risk but who, if provided with housing, might never harm anyone. Moreover, preventive policies will inevitably result in a further intrusion on the privacy of tenants, rendering public housing a less attractive option for many of the blameless individuals whom MHA is charged to serve. B.A. Glesner, Landlords as Cops: Tort, Nuisance & Forfeiture Standards Imposing Liability on Landlords for Crime on the Premises, 42 Case W. Res. L. Rev. 679, 683, 763 (1992).

The fifth factor, like the first and second, favors, by a small margin, the imposition of a duty on MHA. Although some preventive policies might be expensive and onerous, simply evicting Miller following the knife attack would undoubtedly have been feasible. The one-strike policy, if consistently enforced, would naturally produce a safer environment. Housing authorities routinely deny housing to individuals based on factors indicating their potential risk of violence. According to information received by Human Rights Watch in response to a Freedom of Information Act Request to the U.S. Department of Housing and Urban Development ("HUD"), public housing authorities required to provide data to HUD denied admission into project-based public housing to 46,657 applicants under "one strike" tenant screening procedures in 2002. Human Rights Watch, No Second Chance: People with Criminal Records Denied Access to Public Housing (2004), available at http://www.hrw.org/en/reports/2004/11/17/no-second-chance?print (last visited Jan. 6, 2009). As previously stated, MHA was aware of Miller's attack on Tiplett and took steps to reprimand him. Even though Miller successfully completed his period of probation as a tenant and some four years had passed since the 1998 incident, there is no credible suggestion that the additional step of evicting him was not a feasible option.

The sixth factor, the costs and burdens of safer conduct, slightly favors the Plaintiffs. Some steps, such as evicting tenants following violent confrontations, might have low costs and affect a small number of tenants. In this instance, for example, taking the additional step of evicting Miller may have resulted in minimal administrative expense. Other preventive measures, on the other hand, such as more closely monitoring the activities of tenants or probing their backgrounds more aggressively, would likely create both greater costs to MHA and greater burdens on tenants and potential tenants. At this stage, however, because the menu of potential safer measures includes some less expensive steps, this factor favors submission of the liability question to the jury.

The seventh and eighth factors – the usefulness and safety of the alternative conduct – do not strongly favor either conclusion. On one hand, the facts of this case alone demonstrate that evicting tenants after violent confrontations may increase the safety of other tenants in that same building.

---

[10](...continued)
criminal activity in the neighborhood alone will impose a duty on the landlord. Providing security to tenants costs money, and some tenants would not be able to afford the rent a landlord would have to charge to provide security in high crime areas. The result would be that low-income persons may find themselves without any housing.

It is less clear, however, whether these evictions would serve the safety of the public as a whole or simply export risk from one place to another.[11] Eviction is not incarceration. An individual who is evicted because he poses a risk must relocate somewhere else and pose the same risk there. See Rosin, American Murder Mystery (discussing data showing that dense areas of violent crime exist in neighborhoods surrounding large housing projects in Memphis, and subsequent "hot spots" of crime have arisen in areas of Memphis where former public housing residents had relocated when their projects were demolished). The costs associated with providing a more secure facility and the need to accommodate low-income tenants are competing forces. A housing authority provides a valuable societal purpose. Nevertheless, on balance, closely monitoring tenants with prior criminal records or subjecting tenants to a re-certification process by use of NCIC or other available means to ascertain violent propensities does not appear to be overly burdensome.

For a duty to exist, the conduct of a defendant must create a recognizable risk to either a plaintiff or a class of persons, such as tenants in an apartment building. Restatement (Second) of Torts § 281, cmt. c. Consideration of foreseeability necessarily involves an assessment of the likelihood of harm serious enough in nature to take precautionary steps. In making this determination, courts must ascertain whether the defendant had the obligation of vigilance. Satterfield, 266 S.W.3d at 367. By viewing the complaint of the Plaintiffs in the light most favorable to the validity of their claims, we must conclude that tenants within the Jefferson Square Apartments could, with reasonable foreseeability, have been exposed to a risk of violent attacks resulting in physical harm. At this stage in the proceedings, MHA has offered no explanation why a duty to act with reasonable care to reduce its tenants' unreasonable risk of physically injurious attack would have an impermissible adverse effect on its ability to provide affordable housing to low income tenants.

**Conclusion**

In summary, a special relationship exists between a landlord and a tenant, placing an obligation on a landlord to take reasonable measures of protection. Because a reasonable person could foresee the probability of violence in Jefferson Square and because the gravity of the potential harm outweighs, although marginally in this instance, the burden of taking protective measures for the safety of the tenants, we are unable to determine as a matter of law that the Plaintiffs are not entitled to recovery on a claim of negligence under any version of the facts. There are, therefore, genuine issues that preclude a summary judgment favorable to MHA.

Our ruling does not foreclose the possibility that the Plaintiffs will be unable to present sufficient evidence to support the claim or that MHA will successfully defend the propriety of its actions under all circumstances. All landlords – whether public housing authorities or the owners

---

[11] At times, evictions may even inflame violence. For example, the Knoxville News-Sentinel reported that 19-year-old alleged gang member Kojak Lewis' "criminal convictions got his family evicted from a housing project in Northwest Knoxville, and he moved with his family to East Knoxville, home of rival gang, the East Side, according to police. Lewis was shot as he stood on a sidewalk." Lewis "was the first known . . . gang member to be gunned down gang-style [in Knoxville]." Jamie Satterfield, Inner-City Gangs Targeted by Latest KPD Initiative; Members Blamed for Drug Trade, Shootings, Knoxville News-Sentinel, July 29, 1996, at A1.

of luxury high-rises – have a duty to use reasonable care to protect their tenants from unreasonable risks of physically injurious attacks by third parties, if those risks are foreseeable and public policy considerations do not militate otherwise.  However, the question of what steps, if any, are required by the duty of reasonable care will inevitably depend on the facts of individual cases and should be left to the finder of fact, not the courts.  The judgment of the Court of Appeals is reversed, the summary judgment as to the Plaintiffs' tort claim is set aside, and the cause is remanded to the trial court for further proceedings.

Costs are assessed against MHA, for which execution may issue if necessary.

_____
GARY R. WADE, JUSTICE