IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 24, 2013 Session

## MARY SUE COOK v. EAST TENNESSEE HUMAN RESOURCE AGENCY, INC., ET. AL.[1]

**Appeal from the Circuit Court for Blount County**
**No. L16008     Hon. David Reed Duggan, Judge**

_____

**No. E2012-01136-COA-R3-CV-FILED-FEBRUARY 27, 2013**

_____

This is a negligence case in which Passenger sued ETHRA and Driver for injuries she sustained when exiting an ETHRA public transit vehicle. The trial court dismissed the claim against Driver but denied ETHRA's motion for summary judgment. Following a bench trial, the court dismissed the claim against ETHRA, holding that Passenger failed to prove that Driver was negligent. Passenger appeals. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Ronald J. Attanasio, Knoxville, Tennessee, for the appellant, Mary Sue Cook.

Nathan D. Rowell and Brian R. Bibb, Knoxville, Tennessee, for the appellee, East Tennessee Human Resource Agency, Inc.

### OPINION

### I. BACKGROUND

The East Tennessee Human Resource Agency, Inc. ("ETHRA") is a governmental entity that provides, among other services, a shuttle service for little or no cost to those in

_____

[1]Don Scott was dismissed from the suit pursuant to Tennessee Code Annotated section 29-20-310(b). His dismissal was not raised as an issue on appeal.

need of transportation. ETHRA was hired to transport Mary Sue Cook ("Passenger") to and from her home in Loudon County to a dialysis clinic in Blount County.

On December 14, 2006, Don Scott ("Driver"), who had driven Passenger to her dialysis appointment on one prior occasion, arrived at Passenger's home in an ETHRA public transit van. Driver met Passenger at the door of her house, carried her bags, led her to the van, and opened the van's side doors. Once Passenger was inside the van, Driver strapped Passenger into her seat and closed the doors. The drive to Blount County was uneventful. Upon arrival, Driver turned on the interior lights, opened the side doors, unhooked Passenger's seatbelt, and removed her bags from the van. Passenger, who had just woke from a nap, held onto a pole attached to the ceiling of the van as she attempted to step down from the van's interior step onto the exterior step.[2] For reasons unbeknownst to Passenger and Driver, Passenger fell from the van and landed on the sidewalk. Driver attempted to assist Passenger but ultimately summoned help from the dialysis clinic. Someone called an ambulance, and Passenger was transported by ambulance to a hospital.

As a result of the fall, Passenger fractured her hip, requiring extensive treatment, a long-term recovery, and medical expenses in excess of $76,000.[3] Pursuant to the Governmental Tort Liability Act ("the GTLA") Passenger filed a negligence suit against ETHRA and Driver (collectively "Defendants"), alleging that Defendants "breached their duty to provide her with a safe transit system and to provide her with the level of care commensurate with her needs, including but not limited to assisting her in and out of the vehicle." She asserted that "she exercised due care and caution for her own safety and that she was free of any negligence." She requested a jury trial. Defendants denied the allegations of negligence and asserted that Driver was not a proper party and that the matter should be tried without a jury. Shortly thereafter, the trial court dismissed Driver as a party pursuant to Tennessee Code Annotated section 29-30-310(b) and denied Passenger's request for a jury trial pursuant to Tennessee Code Annotated section 29-20-307. ETHRA then filed a motion for summary judgment. The trial court denied the motion, finding that genuine issues of material fact remained, namely

> (A) the extent to which the policies of [ETHRA] require assistance to passengers;

---

[2]Driver insisted that he offered his hand to Passenger to aid her in exiting the van, while Passenger maintained that Driver never offered his hand.

[3]The parties stipulated that Passenger suffered injuries that were "causally connected" to the fall and that she received medical care that was reasonable and necessary for the treatment of her injuries.

(B) whether [ETHRA] breached a policy, if any, which requires assistance to passengers;

(C) the location of [Driver] at the time of the fall;

(D) factual issues regarding [Passenger's] exit from the van [];

(E) the legal cause of the fall; [and]

(F) the extent of the fault, if any, of both [Passenger] and [ETHRA].

A hearing was held at which several witnesses testified and deposition testimony was read into the record. A portion of Driver's deposition testimony was read into the record. Driver testified that he was hired by ETHRA in 1995 and that he received extensive training each year of his employment. He stated that through his training, he learned, among other things, safety procedures and the procedure for helping passengers in and out of the van. He related that his initial training occurred in the classroom but that when he finished the classroom training, he had the opportunity to practice the procedures using the van. Relative to the van, Driver testified that he inspected the van before and after each trip. He related that on the day in question, the van's exterior step was not bent or rusted.

Driver recalled that he had transported Passenger once without incident. He related that on December 14, he woke up, retrieved the van from ETHRA, and drove to Passenger's house. After he arrived at the house, he knocked on the door, retrieved Passenger's bags, and led Passenger to the van. He stated that Passenger held onto his right arm as he walked her to the van and that he opened the van doors for Passenger, who "got in [the van] with no problem." He then "hooked her seat belt up for her and shut the doors." When they arrived at the dialysis clinic, he "pulled up to the [curb], turned on the interior lights, got out, went around the van, opened both doors, [] unhooked her seat belt, and set her luggage and stuff out on the ground." He related that he was standing "inches" from the van on Passenger's right side as she got out of the van, held onto a pole with her left hand, and grabbed his left hand with her right hand. He stated that "as she stepped down with her left leg, she stepped on the bottom step and turned 360 and fell on the ground."

Driver testified that after Passenger fell, he checked on her and then went into the clinic for assistance. He stated that once Passenger was taken to the hospital, he called his supervisor and filled out an incident report in which he stated that as Passenger "was going down for the last step her foot missed the step." He later spoke with the safety coordinator, Leslie Johnson, about the incident. He said that his employment was ultimately terminated by ETHRA because he could not pass his yearly physical. He related that his blood sugar

levels were too high and that he had become diabetic. He insisted that while he was employed by ETHRA, he was never disciplined or chastised for his performance.

A portion of Michael George Patterson's deposition was also read into the record. Mr. Patterson stated that he was the Director of Transportation for ETHRA and that he was the designated corporate representative for purposes of this litigation. He testified that a safety coordinator was responsible for training the drivers, ensuring that the drivers received the required 35 hours of training, and documenting accidents and customer complaints. He related that each driver was required to assist passengers by helping him or her enter and exit the van. He admitted that it was "always a possibility" that a passenger may fall when exiting the van because most of the passengers were elderly, disabled, frail, or had balance problems.

Leslie Johnson testified that he had been the safety instructor for ETHRA since 2001. He investigated accidents, generated reports as a result of his investigations, and submitted the reports, which were eventually given to the Director of Transportation. In his investigation of Passenger's accident, he visited Passenger and asked her questions about her fall. He could not remember his questions or her answers. He also spoke with Driver, but he could not remember his questions or Driver's answers. He related that the information he gathered would have been included in his report, which he generated after the accident. He no longer had access to the report and did not know where the report was located.

Passenger's son, Keith Allen Cook, testified that in November 2006, Passenger had started dialysis and was 74 years old. He and his brother transported her to her dialysis appointments, but per her doctor's suggestion, they eventually arranged for her transportation through ETHRA. He recalled that while Passenger was still capable of driving, he would not allow her to drive because she was "weak." He stated that Passenger's balance or stability was "okay" but that "she had her moments" after she started treatment. When he learned of Passenger's fall, he visited Passenger in the hospital. He claimed that while he was waiting in the hospital room with Passenger, Mr. Johnson visited and asked her if Driver had assisted her when she stepped down from the vehicle.

Mr. Cook testified that Passenger stayed in a rehabilitation facility for four weeks until she moved in with him and his family for six months. He related that Passenger was "emotionally stressed" while she underwent rehabilitation and that she used a cane to support herself for awhile. He admitted that she eventually resumed driving and was able to transport herself to her dialysis appointments. He claimed that Passenger was still "weak" but

conceded that after a long process of rehabilitation, she was capable of caring for herself and had moved back into her house for a significant period of time.[4]

Mr. Cook inspected the van after Passenger's fall and learned that the opening through which Passenger would have fallen was approximately 42 inches wide. He related that the van's side doors opened perpendicular to the van and were not capable of opening any wider. A video depicting Mr. Cook entering and exiting the van was introduced into evidence.

Passenger testified that Driver did not cause her to fall and that the step did not break. However, she asserted that Driver was not holding her hand when she fell. She related that during her first trip with Driver, he also did not hold her hand or assist her as she stepped out of the van. She recalled that Driver attempted to help her when she fell. She admitted that Driver was courteous and that he met her at the front door, walked with her to the van, carried her luggage, and opened the doors for her. She also admitted that she never asked Driver to help her get in or out of the van and that she did not have any problem walking to the van or getting inside the van. She remembered that Driver also opened the doors for her and retrieved her luggage when they arrived at the clinic. She did not know what caused her to fall. A portion of Passenger's deposition was read into the record in which she stated that she would not have fallen if Driver had held her hand as she stepped out of the van.

Following the hearing, the trial court dismissed the case against ETHRA, finding that Passenger "failed to carry her burden of proof." Specifically, the court noted that Driver had an obligation to *assist* Passenger but was not necessarily required to hold Passenger's hand. The court found Passenger and Driver to be credible witnesses but ultimately credited Driver's statement that he held Passenger's hand as she stepped down from the van over Passenger's assertion that Driver did not hold her hand. The court acknowledged the inconsistencies between Driver and Passenger's accounts but stated,

> I just don't feel like I have in front of me sufficient evidence to find that [Passenger] carried her burden of proof in addition to finding [Driver's] account to be credible, [] especially in light of the fact that the proof also establishes that she was not on a cane or a walker at the time [and that] there was no assistive device. Her son testified that basically no assistance was needed at the time, that she got along fine unassisted[, and] that after the incident she was able to move back into her home and live alone and resume driving.

This timely appeal followed.

---

[4]At the time of trial, Passenger resided with Mr. Cook.

## II. ISSUES

We consolidate and restate the issues raised on appeal as follows:

A. Whether the trial court erred in dismissing Passenger's claim against ETHRA.

B. Whether the trial court erred by failing to consider the absence of Mr. Johnson's report pursuant to the "missing evidence rule."

## III. STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d). The trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

This case presents a unique scenario because some evidence was submitted through live testimony, while other evidence was submitted through depositions. "When the trial court has seen the witnesses and heard the testimony, especially where issues of credibility and the weight of testimony are involved, the appellate court must extend considerable deference to the trial court's factual findings." *Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 732 (Tenn. 2002) (citations omitted). However, an appellate court may independently assess the weight and credibility of deposition testimony because the appellate court is in the same position as the trial court in evaluating proof that is submitted by deposition. *Id.*

## IV. DISCUSSION

### A.

The GTLA provides that governmental entities are immune from suit for injuries arising from activities "wherein such governmental entities are engaged in the exercise and discharge of any of their functions, governmental or proprietary." Tenn. Code Ann. § 29-20-201(a). While the GTLA forecloses most suits filed against a governmental entity, an exception is outlined in Tennessee Code Annotated section 29-20-205. The exception

permits a party to file suit against a governmental entity when an employee of that entity acting within the scope of his or her employment negligently causes injury to another. Tenn. Code Ann. § 29-20-205.

Passenger asserts that Driver was negligent because he failed to assist her as she exited the van. She acknowledges Driver's claim that he held her hand as she stepped down from the van but claims that the circumstantial evidence supported her theory, namely that Driver never held her hand. ETHRA responds that the court's judgment was not dependent upon whether Driver held Passenger's hand. ETHRA responds that the court did not err by dismissing the claim because Passenger failed to establish that Driver breached the requisite standard of care, because Passenger failed to establish the cause of her fall, and because Passenger was at least 50 percent or more at fault for her injuries.

In order to prevail in a negligence action in Tennessee, the plaintiff must prove that (1) a duty of care was owed by the defendant; (2) the defendant's conduct fell below the applicable standard of care, resulting in a breach of the duty; (3) the plaintiff suffered an injury or loss as a result of the breach of the duty; (4) the defendant's breach of the duty was cause in fact of the injury or loss; and (5) the defendant's breach of the duty was the proximate or legal cause of the injury or loss. *McClung v. Delta Square Ltd., P'ship*, 937 S.W.2d 891, 894 (Tenn. 1996). The analysis of duty is specific to the particular plaintiff and defendant involved. *Nichols v. Atnip*, 844 S.W.2d 655, 662 (Tenn. Ct. App. 1992). Whether a defendant owed a duty is a question of law, and whether that duty was breached is a question of fact. *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 366 (Tenn. 2009); *see also Biscan v. Brown*, 160 S.W.3d 462, 478 (Tenn. 2005).

The parties agree that a duty of care existed but disagree as to whether Driver's conduct fell below the applicable standard of care. In non-jury trials, "the extent of the applicable standard of care [is] for the court to decide based on the evidence and mixed considerations of logic, common sense, and public policy." *White v. Metro. Gov't of Nashville and Davidson Cnty.*, 860 S.W.2d 49, 51-52 (Tenn. Ct. App. 1993). Indeed,

> [c]ourts customarily define the scope of a duty or a particular standard of care by looking to the statutes, regulations, principles, and other precedents that make up the law. However, they may also consider evidence that tends to establish a custom representing the common judgment concerning the risks of a particular situation and the precautions required to meet them. Thus, company work rules, while not controlling, are admissible to demonstrate what the company's employees should have done in a particular situation.

*Id.* (internal citations omitted).

In this case, Passenger hired ETHRA for its door-to-door transportation services. ETHRA's advertisement provided that drivers were responsible for assisting each passenger "in and out of the vehicle" and with packages. Likewise, drivers were given guidelines, which provided, in pertinent part,

1. Never grab hold of a person unexpectedly. This could startle the passenger and make them fall.

2. Always stand behind someone who has asked not to be helped. You may need to break a fall.

3. Talk your passengers through all of your actions with them. They will feel more comfortable and easier to assist if they know what to expect.

4. Watch your loading and unloading location and avoid problems with surface types or surface levels.

5. Be patient, give your clients time to load and unload safely.

6. Assist clients with unloading packages from the van. But under *no circumstances* are you to go into the home.

7. When you are out of the van to assist passengers. Make sure your van is in park and your keys are in your pocket.

8. Keep your step clean.

9. Keep the inside of the van clean and clear of obstacles.

10. Escorts are allowed for any customer that cannot mentally or physically function without additional assistance other than the driver.

11. Ambulatory customers can request to enter the vehicle by using the handicapped lift. Caution should be taken in assisting the customer.

12. Drivers cannot refuse to transport[] a customer due to a physical or mental disability. If a driver cannot physically assist a customer due to weight or condition of surroundings, know your limitation and ask dispatch for assistance.

The record on appeal reflects that ETHRA provided door-to-door assistance to elderly or disabled passengers. ETHRA never provided a bright-line rule to its drivers regarding the level of assistance required because each passenger presented unique challenges. Drivers were essentially responsible for making an independent determination regarding the level of assistance required by observing each passenger and offering assistance when necessary. In this case, Driver had transported Passenger on one prior occasion in which a high level of assistance was unnecessary because she stepped in and out of the van without incident. On the day in question, Driver carried Passenger's luggage to the van, walked with her, opened the doors for her, hooked her seatbelt, and closed the doors. Upon arrival, Driver turned on the interior lights, retrieved Passenger's luggage, opened the doors, and unhooked her seatbelt. Regardless of whether Driver offered his hand to Passenger as she descended from the van, Passenger had previously entered the van twice and exited the van once without assistance from Driver. Passenger readily admitted that she did not ask for help when she entered or exited the van and that she did not use an assistive device such as a cane or walker. The evidence in the record also did not establish that Passenger appeared as if she needed additional assistance above that which was already provided. With these considerations in mind, we conclude that Driver provided the appropriate level of assistance under the circumstances even if he failed to offer his hand as Passenger descended from the van. Accordingly, we affirm the judgment of the trial court because Passenger failed to establish Driver's breach of the standard of care. Having affirmed the court's decision, the alternative arguments pertaining to causation and comparative fault are pretermitted.

B.

Passenger asserts that the trial court erred by failing to apply the missing evidence rule. She contends that Mr. Johnson's report, which was withheld by ETHRA, likely contained further information on the issue of whether Driver held her hand as she attempted to disembark from the ETHRA van. Having concluded that Driver did not breach the standard of care regardless of whether he held Passenger's hand, this issue is pretermitted.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Mary Sue Cook.

_____
JOHN W. McCLARTY, JUDGE

-9-