# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### June 25, 2009 Session

## COREY GREENE, ET AL. V. YASEEN TITI D/B/A CRUSH NIGHT CLUB, ET AL.

### Appeal from the Circuit Court for Davidson County
### No. 06C1188    Thomas Brothers, Judge

———

### No. M2008-02788-COA-R3-CV - Filed January 11, 2010

———

This negligence action arose from a gunshot injury suffered by the plaintiff, Mr. Greene, when he was a customer at the co-defendant's night club in Nashville. The shooter was never identified. Mr. Greene filed suit against the night club and the agency providing security at the club, claiming that the security agency was negligent in allowing an individual into the club with a weapon.[1] The defendant security agency moved for summary judgment. After a hearing, the trial court granted summary judgment in favor of the defendant security agency, holding that the agency affirmatively negated an element of Mr. Greene's claim by refuting his allegation that a security guard accepted a bribe and by showing that the agency did not breach any duty to Mr. Greene. The plaintiffs timely appealed. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J. joined, and D. MICHAEL SWINEY, J. filed separate concurring opinion.

Aaron S. Guin and Mark W. Honeycutt, II, Nashville, Tennessee, for Appellants, Corey Greene and Caroline Greene.

Travis B. Swearingen and William S. Walton, Nashville, Tennessee, for Appellee, Tennessee Protection Agency, Inc.

### OPINION

### I. BACKGROUND

This negligence action arose from a shooting that occurred at Crush Night Club ("the Club")

---

[1]Mrs. Greene filed a loss of consortium claim.

in Nashville on May 14, 2005. The Club is owned by co-defendants Yaseen Titi and Mohammad Titi. Co-defendant/appellee Tennessee Protection Agency ("TPA") provided security to the Club.

A few minutes before midnight, plaintiff/appellant Corey Greene entered the Club as a customer. Mr. Greene and two friends waited in a line of fifteen to twenty people before passing through a TPA security checkpoint at the front door. The checkpoint included a "pat-down" for weapons.

The Club had stairs leading from the front door to a bar. The stairs then continued down to a second bar and the main dance floor. As Mr. Greene and his friends moved down the stairs toward the dance floor, they passed a group involved in an argument. An unidentified man ("John Doe No. 1" or "Shooter") was pushed during the argument and fell against Mr. Greene. Mr. Greene caught Shooter as he was falling, and Shooter reacted by demanding to know what Mr. Greene was doing. According to Mr. Greene's deposition testimony, he heard one of Shooter's friends call for a gun, and then Shooter displayed a weapon. Mr. Greene testified:

> When I seen the gun pointed at me, I mean, the guy was close enough and I thought
> he was going to shoot me so I tried to grab his arm. When I grabbed his arm, that's
> when the gun went off a couple of times.

Mr. Greene was shot three times in the leg and hip. A TPA guard, Joshua Butler, cut off Mr. Greene's pants and tried to stop the bleeding. Paramedics arrived at the scene a few minutes later. Mr. Greene underwent surgery, was hospitalized for three days, and required subsequent physical therapy.

TPA agreed to provide security to the Club in a "Security and Safety Consultant Agreement" ("Agreement") dated November 1, 2004. The Agreement was signed by Charles Grider, owner of TPA, and initialed by Mohammed Titi. TPA agreed "to perform all services and acts as may be reasonably assigned" by the Club, including specific services listed of providing a "Posted Unarmed Officer" and a "Posted Armed Officer." For both types of officers, "N/A" was written on the lines in the Agreement providing for the number of officers to be assigned. The Agreement also included an indemnity provision.

Three security guards who worked on the night of the shooting gave deposition testimony, including Mr. Butler, John Greene (no relation to plaintiff), and head security guard, Earnest McDaniel. All three worked part-time for TPA on a per-diem basis, and all were licensed as Security Agents in Tennessee. Mr. McDaniel worked part-time for TPA for nine years and had experience working at the Club since 2004. He testified that the Club was "pretty rough" with "probably about three fights a night, if not more." The other guards reiterated this description, with Mr. Butler testifying that working at the Club was "Rough. A bulletproof vest every night, rough."

On the evening of the shooting, Mr. McDaniel remembered ten to twelve guards on duty and he believed that TPA "probably needed anywhere from about 16 to 18." It was the club owners'

decision to assign the number of guards to the Club on any particular night. While the head security guard could ask for more guards or alert additional guards to be on call, additional guards would only be assigned to the Club if the owners consented. Mr. McDaniel testified that on the night of the shooting, he told the owners that he thought the Club was "undermanned," but the owners did not authorize additional guards.

All of the guards testified that keeping weapons out of the Club was part of their duty. Mr. McDaniel testified that weapons did not normally get in the Club, explaining, "Any concert nights, we wouldn't even let fingernail files in." Describing the pat-down procedure, Mr. McDaniel stated:

> As far as the pat-down, you go head to toe. If you have a hat on, lift your hat up. If you have a coat, you got to lift your arms up, go up under the armpits, down your waist side, around in front of the chest, around the back of the chest, around the waist, down to each pocket, and then around the legs and around the rims of the shoes. As far as females, same way, but you go between the breasts and up under the wires of the bra.

The guards also testified that they had used wands for a while but felt that pat-downs were more effective. There was no metal detector at the Club.

According to the evidence in the record, the Club had four doors leading in from the outside. TPA Guards were posted at the front door, the back door (near the dance floor), and in the general area of a locked side door. An additional locked "side door," located across a hallway from the Club office, was not guarded. The only legitimate entrance for customers was the front door. Customers entered the Club through either a regular line or a "VIP" line at the front door. Customers in the VIP line paid a higher entrance fee and were rewarded with a shorter security line, but customers in both lines were patted down and had their belongings searched for weapons and illegal drugs.

The three TPA guards testified that on the night of the shooting, they did not let anyone enter the club through the back or side doors. They also did not let anyone in without a pat-down search and did not know of any other guards who permitted customers to enter without a pat-down search. Mr. Greene testified in his deposition that on two prior occasions, he was allowed into the Club without being searched by two different security guards who recognized him. However, Mr. Greene was not certain whether those guards worked for TPA, and on the night of the shooting, he did not see either of them. Mr. Greene admitted that on the night in question, he did not see anyone enter the front door without being searched by TPA guards. However, Mr. Greene also testified that as he approached the Club, he walked by the back door and saw an individual being let in by someone from the inside.

The TPA guards testified that they did not know how the gun got inside the Club on May 14, 2005. However, they suspected that the gun had come in through a "promoter." Promoters advertised the Club on the street, spreading word about the establishment and making fliers and signs. The guards stated that promoters would sometimes bring individuals into the Club as special "VIPs" and inform the guards that these individuals did not need to be searched. None of the guards

remembered any specific person entering the Club without a search on the night of the shooting. All three guards, however, testified that they had complained to the owners about a specific promoter named "Taylor" who often brought in unauthorized individuals. Mr. McDaniel suspected that Taylor let someone in the side door across from the office on the night of the shooting, but no direct evidence was presented of this. When asked what could have been done to prevent the shooting, Mr. McDaniel replied, "We could have got rid of Taylor."

Mr. Greene alleges that the Club had been "the location of a number of violent acts" requiring police investigation. He asserted that he had gone to the Club nearly every weekend for about a year before the shooting, and he witnessed fights at the Club nearly every weekend but none involving weapons.

Mr. Greene testified that after the shooting, he received information from Joey Johnson that a TPA guard took a $50 bribe from Shooter to let him enter the Club with a gun. Mr. Greene believed that Mr. Johnson obtained this information from Mario Hambrick, who previously worked for TPA. In an affidavit admitted to the record, Mr. Hambrick asserted that TPA once employed him, but he had never worked at the Club. Mr. Hambrick also stated that he never met or spoke to Mr. Greene and that he had "never seen, experienced, or been told of any TPA guards accepting money in exchange for allowing an individual to either bring a weapon into an establishment or enter an establishment without receiving a pat down." Mr. Greene also testified that he learned from his cousin's friend, who occasionally worked security at the Club, that there was a general practice of guards taking bribes to allow people to enter the club with guns. Mr. Greene did not know this friend's last name, and the individual did not offer testimony. The three guards who testified specifically denied receiving bribes.

Mr. and Mrs. Greene filed the instant action for negligence and vicarious liability against TPA, Yaseen Titi and Mohammed Titi as co-owners of the Club, and Ranger Investments as the owner of the premises and lessors to the Club. The Greenes also named two unidentified individuals in the negligence suit: "John Doe No. 1" as the shooter and "John Doe No. 2" as the TPA guard who allegedly accepted a bribe. Yaseen Titi later filed a cross-claim of negligence against TPA. The complaint was later amended to name 178 2nd Avenue North, LLC as the property owner. The trial court subsequently granted summary judgment to 178 2nd Avenue North, LLC, finding that the company had purchased the property where the Club was located five months after the shooting incident. The court did not reach a negligence analysis for the property owners/lessors.

TPA moved for summary judgment on all claims against it, which the trial court granted on November 18, 2008, after a hearing on the motion. The trial court concluded:

TPA has affirmatively negated an element of the Plaintiffs' claim by offering testimony and evidence which refutes Plaintiffs' claims that TPA breached any duty to the Plaintiffs or was otherwise negligent. The Court finds that the undisputed material facts demonstrate that TPA's guard did not accept a bribe to allow a weapon into the Club. Accordingly, the Plaintiffs' claims, including Mrs. Greene's derivative

4

loss of consortium claim, fail as a matter of law.

The trial court also found that Yaseen Titi's cross-claim was dependent on a finding of negligence against TPA and therefore failed as a matter of law. Mr. Greene timely appealed.

## II. ISSUES

The central issue of this appeal is whether the trial court erred in holding that TPA did not breach a duty to Mr. Greene. Mr. Greene contends that genuine issues of material fact exist precluding summary judgment for TPA as a matter of law. We restate Mr. Greene's specific issues on appeal as follows:

A.      Whether TPA, as a security contractor to the night club owners, owed a duty of care to Mr. Greene as a night club customer, to protect him from a gunshot injury inflicted by a third party.

B.      If TPA owed a duty to Mr. Greene, whether the trial court erred in holding that no genuine issue of material fact remained to establish a breach of TPA's duty.

C.      Whether the trial court erred in holding that Mrs. Greene's loss of consortium claim must be dismissed as a derivative of Mr. Greene's claim against TPA.

## III. STANDARD OF REVIEW

In reviewing a trial court's grant of summary judgment, this court must determine whether the requirements of Tenn. R. Civ. P. 56 have been met. *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 88 (Tenn. 2000). Our inquiry involves only a question of law with no presumption of correctness attached to the trial court's judgment. *Id.* Under Tenn. R. Civ. P. 56.04, "[s]ummary judgment is appropriate when the moving party can show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Hannan v. Alltel Publ'g*, 270 S.W.3d 1, 5 (Tenn. 2008) (citing Tenn. R. Civ. P. 56.04; *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993)). In Tennessee, the moving party has the burden of production and to shift that burden to the nonmoving party must either

(1)      affirmatively negate an essential element of the nonmoving party's claim; or

(2)      show that the nonmoving party cannot prove an essential element of the claim at trial.

*Hannan*, 270 S.W.3d at 9. A "conclusory assertion" is not enough to shift the burden. *Id.* at 5 (quoting *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)). It is also not enough for the moving party to "cast doubt on a party's ability to prove an element at trial." *Hannan*, 270 S.W.3d at 8. Therefore, summary judgment for TPA was warranted if it could either affirmatively negate an essential element of Mr. Greene's negligence claim or show that Mr. Greene would not be able to prove an essential element of negligence at trial.

## IV.  ANALYSIS

### A.  DUTY OF CARE

#### 1.  GENERAL DUTY OF CARE

To successfully establish a negligence claim, a plaintiff must prove the following essential elements: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal cause." *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d, 359, 364 (Tenn. 2009) (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)). In the case at bar, the trial court held that TPA satisfied its burden of proof in negating Mr. Greene's claim that TPA breached a duty. The threshold question in this analysis is whether TPA owed a duty of care; without a duty of care, there can be no conduct that breaches that duty. *See Hale v. Ostrow*, 166 S.W.3d 713, 715 (Tenn. 2005); *Bailey v. Grooms*, No. E2008-01520-COA-R3-CV, 2009 WL 3460654, at *3 (Tenn. Ct. App. E.S., Oct. 28, 2009).

Individual persons share a general duty to use reasonable care to refrain from conduct that will foreseeably cause harm to others. *Giggers*, 277 S.W.3d at 364; *see also Collins v. Arnold*, No. M2004-02513-COA-R3-CV, 2007 WL 4146025, at *7 (Tenn. Ct. App. M.S., Nov. 20, 2007). However, this duty does not generally extend to a duty to control the behavior of others who may cause harm to a third party. *Biscan v. Brown*, 160 S.W.3d 462, 478 (Tenn. 2005); *Collins*, 2007 WL 4146025, at *7. Such a duty may arise for certain special relationships, such as parent to child and innkeeper to guest. *Biscan*, 160 S.W.3d at 479 (citing with approval the "socially recognized relations" of "parent and child, employer and employee, and innkeeper and guest" in the Restatement (Second) of Torts §§ 314-315 (1965)). The special relationship must be between either the defendant and the plaintiff or the defendant and a third party accused of causing the plaintiff's injury. *Biscan*, 160 S.W.3d at 478-79.

The relationship between business owners and occupiers of business premises does not generally give rise to a duty of care to protect customers from the criminal acts of third parties. *McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 902 (Tenn. 1996). However, a business does have a duty to take "reasonable steps to protect customers" against the foreseeable criminal acts of third parties. *Id.* Protection in this case includes those actions over which the business owner has

6

control. *See Collins*, 2007 WL 4146025, at *11. In *McClung*, the Tennessee Supreme Court held that the owners of a shopping mall in an area with a recent history of high crime in parking lots owed a duty to provide security in the mall parking lot. *Id.* at 903-04. Because the mall owners had notice of the recent high crime rate, they had a duty to take reasonable precautions, which included providing security in an area where many businesses already were doing so. *Id.* However, it is a generally accepted principle that "a defendant's duty to control the conduct of another depends in part on the defendant having the means and ability to control the third party." *Collins*, 2007 WL 4146025, at *11 (quoting *Biscan v. Brown*, 160 S.W.3d 462, 478 (Tenn. 2005)).

Whether the Club, the business in this case, owed a duty to protect customers from the criminal actions of third parties would require analysis of whether the Club's owners knew or should have known from observation or experience that those criminal acts were foreseeable. *See id.* The foreseeability of harm and the gravity of harm would then be balanced against the burden imposed on the business to protect against the harm. *Id.* The Club had already taken the action of hiring security, and through its agreement with TPA, the amount and type of security was determined by Club owners. Whether the Club could have controlled the actions of a third party who brought a gun into the Club, beyond providing security as a preventative measure, is a question beyond the scope of this analysis. This appeal concerns not the Club, the business owner, but a contractor providing security to the business under the provisions of a signed Agreement, which gave the contractor a limited scope of control.

Under its Agreement with the club, TPA provided armed and unarmed guards at the club's doors. TPA guards also testified unanimously that they understood their job to include keeping weapons out of the Club. The Agreement stated that TPA as the "Consultant" would perform duties "as may be reasonably assigned" by the Club. The Agreement did not specify the number of guards to be posted, and Mr. McDaniel's testimony that it was the Club owners' decision to assign the number of guards is undisputed. It is also undisputed that TPA guards were posted at the doors to which they had been assigned and that they were searching customers on the night of the shooting. According to the deposition testimony, a factual question may exist as to whether promoters, working in association with the Club, allowed a third party to enter the Club, who may have been carrying a gun. However, such a question is immaterial to this appeal because TPA guards did not have the means and ability to go beyond the bounds of the Agreement and control the actions of owners and promoters. *See Collins*, 2007 WL 4146025, at *11 (recognizing that "means and ability" to control the conduct of another "include not just the physical means and ability, but also the legal right to impose physical restraint") (citing *Lett v. Collis Foods, Inc.*, 60 S.W.3d 95, 105 (Tenn. Ct. App. 2001)).

### 2. EFFECT OF INDEMNITY PROVISION

In granting summary judgment to TPA, the trial court also held that the Club owners' cross-claim against TPA failed for two substantive reasons: first, TPA successfully refuted the claim of

negligence, and second, the indemnity provision in the Agreement barred recovery for the Club owners on any negligent actions of TPA.[2]  The cross-claim is not at issue in this appeal, but the indemnity provision is helpful in analyzing TPA's relationship to the Club as a contractor and its subsequent relationship to the Club's customers.  The indemnity provision only bars the Club from seeking recovery against TPA for negligence; it does not bar a Club customer from doing so. However, such indemnity provisions have been held to allow a subcontractor against whom a judgment has been won to recover the judgment from a general contractor who retained control of the overarching project.  *Trinity Indus., Inc. v. McKinnon Bridge Co.,* 147 S.W.3d 225, 233-34 (Tenn. Ct. App. 2003).

Tennessee courts have long recognized that individuals have the right to limit liability through contract, provided that the resulting limitation does not violate public policy.  *Olson v. Molzen*, 588 S.W.2d 429, 430 (Tenn. 1977) (citing *Moss v. Fortune*, 340 S.W.2d 902, 903-04 (Tenn. 1960)).  Where the language of a written instrument is "clear and unambiguous," courts must interpret it as written.  *Trinity*, 147 S.W.3d at 234 (citing *Sutton v. First Nat'l Bank of Crossville*, 620 S.W.2d 526 (Tenn. Ct. App. 1981)).  In *Trinity*, this court held that a subcontractor was entitled to indemnification by the general contractor where the language in their agreement clearly and unambiguously stated that the subcontractor would not be held liable for "action or inaction of a party over which it had no control."  *Id.* at 231.  Our decision in *Trinity* turned on interpretation of the plain language in the indemnification provision.  *Id.* at 231, 234. *See also Thrasher v. Riverbend Stables, LLC*, No. M2008-02698-COA-RM-CV, 2009 WL 275767, at *4 (Tenn. Ct. App. M.S., Feb. 5, 2009).

In the case at bar, the indemnity provision included in the Agreement states:

> The Company [the Club] agrees to indemnify the Consultant [TPA] and hold the Consultant harmless for any acts and omissions of the Consultant and its authorized agents furthering the delivery of services within the scope of employment of the Consultant and furtherance of the Consultant's business; provided that neither Company nor any of its subsidiaries or affiliates, shall indemnify the Consultant for any losses incurred by the Consultant as a result of the Consultant's gross negligence or willful misconduct.

According to the plain language of this provision, the Club agreed to indemnify TPA as long as TPA's "authorized agents," the security guards, were "furthering the delivery of services within the scope of employment."  The Agreement listed specific services that included TPA providing armed and unarmed officers.  By manning the Club's doors and conducting pat-down searches on the night of the shooting, TPA executed its duties under the Agreement, for which the Club agreed to indemnify TPA against liability.  Therefore, the Club indemnified TPA for ordinary negligence that resulted in any loss due to the security guards' acts or omissions while performing their contracted

---

[2]The Club owners also failed to timely file and personally serve a response to TPA's motion for summary judgment.

8

duties.

The second half of the indemnity provision states that the Club did not indemnify TPA against liability for "gross negligence or willful misconduct." This provision aligns with public policy because "[a] party cannot contract away his liability for willful or gross negligence." *Thrasher*, 2009 WL 275767, at \*4 (citing *Memphis & Charleston R.R. Co. v. Jones*, 39 Tenn. 517 (1859)). Mr. Greene relies on *Thrasher* as an example of a case in which this court reversed a trial court's order of summary judgment because the defendant had failed to affirmatively negate an essential element of a negligence claim. This reliance is misplaced because in *Thrasher*, we reversed summary judgment only on the gross negligence claim, on which the defendant was not and could not be indemnified by contract. *Id.* at \*7. We upheld the contract that indemnified the defendant against ordinary negligence. *Id.* at \*4.

In this case, TPA security guards, because of their contractual relationship with the Club owners, only exercised control over the actions within the scope of their contracted duties. This limited control did not give rise to a special relationship between TPA and the Club's customers that would have created a duty to control the conduct of third parties. However, despite TPA's lack of a special relationship with Club customers and its indemnification by the Club from liability for ordinary negligence, TPA owed to customers a duty to avoid gross negligence or willful misconduct.


## B. BREACH OF DUTY

### 1. GROSS NEGLIGENCE OR WILLFUL MISCONDUCT

In the Third Amended Complaint, Mr. Greene charged claims of negligence and vicarious liability against TPA. Mr. Greene did not claim gross negligence or willful misconduct, but in viewing his claim in the manner most favorable to him, his allegation that a TPA guard accepted a $50 bribe to allow Shooter into the Club, if proven, could rise to the level of gross negligence or willful misconduct. The trial court's grant of summary judgment for TPA would be in error if a genuine issue of material fact remained to establish that a TPA guard, as TPA's agent, accepted a bribe, constituting gross negligence or willful misconduct.

To prevail on a claim of gross negligence, a plaintiff must first establish that the defendant was negligent and then, in addition, must show that the negligent act was "'done with utter unconcern for the safety of others, or one done with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law.'" *Thrasher*, 2009 WL 275767, at \*4 (quoting *Ruff v. Memphis Light, Gas, and Water Div.*, 619 S.W.2d 526, 528 (Tenn. Ct. App. 1981)). For an employee's action to constitute "willful misconduct," it must be performed with "[1] an intention to do the act, [2] purposeful violation of orders, and [3] an element of perverseness." *Durant v. Saturn Corp.*, No. M2003-00566-SCWCM-CV, 2004 WL 941012, at \*7 (Tenn. Workers Comp. Panel Apr. 30, 2004).

Mr. Greene alleged in his Third Amended Complaint that a TPA guard accepted a $50 bribe and allowed Shooter to enter the Club with the weapon that injured Mr. Greene. If proven, such an action would likely show that a TPA guard intended to purposefully violate TPA's orders, thus committing willful misconduct. Under the doctrine of respondeat superior, TPA could then be held liable for the guard's willful misconduct. *Willis v. Settle*, 162 S.W.3d 169, 183 (Tenn. Ct. App. 2004) (holding that a private security company was liable for its employee's negligent action in leaving an inmate alone in a hospital room, even though the guard disobeyed the company's policy). Alternately, if TPA knew or should have known that one of its guards was accepting bribes to bring in weapons, ignoring such information could rise to the level of utter unconcern for the safety of others, or gross negligence. However, after reviewing the testimony and evidence offered by TPA to refute Mr. Greene's allegation of bribery, the trial court concluded that "the undisputed material facts demonstrate that TPA's guard did not accept a bribe to allow a weapon into the Club." We agree.

Mr. Greene cites this court's decision in *Thrasher* as an example of a case in which the defendant failed to affirmatively negate an element of the plaintiff's claim. In *Thrasher*, the plaintiff's horse had died when it impaled itself on a lead bar that extended from a "hot walker" training device. *Id.* at *1. We concluded that the defendant stable owners failed to affirmatively negate that they may have been grossly negligent in placing the horse on the hot walker because they offered "facts" to refute the claim that were their own subjective contentions regarding the device's danger and the precautions the trainer had taken. *Id.* at *6. In contrast, in this case, TPA presented deposition testimony from three security guards, who all stated that they knew of no guards who accepted bribes. Moreover, TPA presented the sworn affidavit of Mario Hambrick, who was Mr. Greene's alleged second-hand informant. Mr. Hambrick swore that he had never met Mr. Greene and that he knew of no TPA guard who had accepted a bribe. Mr. Greene offered no further evidence of a bribe, and ultimately, in his own appellate brief, admitted his "inability to conclusively prove that a TPA employee was bribed $50.00 to let a gun enter the club . . . ." Accordingly, no genuine issue of material fact remains to establish a claim of gross negligence or willful misconduct. Therefore, TPA successfully negated an essential element of Mr. Greene's negligence claim.

## 2. *RES IPSA LOQUITUR*

On appeal, Mr. Greene raises an argument that he had not raised in the original negligence complaint. The argument is essentially the following enthymeme:

TPA checked customers for guns.
A gun was in the Club.
Therefore, TPA negligently allowed a gun into the Club.

This enthymeme assumes that the only way a gun could have been in the Club was for TPA to negligently allow it to enter with a customer. Although not stated as such, this is an argument of *res ipsa loquitur*, or "the thing speaks for itself." *See* Black's Law Dictionary 1470 (4th ed. 1968). *Res*

*ipsa loquitur* permits, but does not compel, an inference of negligence. *Benson v. Berryman*, No. W2004-00489-COA-R3-CV, 2005 WL 491536, at \*4 (Tenn. Ct. App. W.S., Mar. 1, 2005) (citing *Scarbrough v. City of Lewisburg*, 504 S.W.2d 377 (Tenn. Ct. App. 1973)). The requirements necessary for applying the doctrine are:

1.      There must be a "thing" causing an injury.

2.      That "thing" must be under the exclusive management and control of the defendant or its servants.

3.      The "thing" must be shown to be of such a nature that injury does not ordinarily result from its careful management.

*Benson*, 2005 WL 491536, at \*4 (quoting *Armes v. Hulett*, 843 S.W.2d 427, 432 (Tenn. Ct. App. 1992)).

Without deciding legal causation, we can say for the sake of argument that the "thing" causing injury in this case was the gun with which Mr. Greene was shot. The argument breaks down, however, at the second requirement. For the weapon to have been under the exclusive management and control of TPA, the gun would have had to be in TPA's possession. In *Benson*, this Court concluded that an elementary school principal and teacher did not have "exclusive power to control the [kindergarten students'] every action" even though they did "enjoy 'exclusive custody and supervision'" of the children. 2005 WL 491536, at \*5 (quoting *Ferguson v. Metro. Gov't of Nashville & Davidson County*, No. 01-A-01-9211-CV00434, 1993 WL 115661, at \*3 (Tenn. Ct. App. M.S., Apr. 16, 1993)). It is undisputed that the gun used to shoot Mr. Greene was in the possession of Shooter, not a TPA agent at any time. Also, TPA guards' security checks did not give them exclusive power to control the actions of the Club's customers or others authorized to enter the Club. Without exclusive control over the gun, or at least over the actions of the person wielding the gun, TPA cannot be found negligent under the doctrine or logic of *res ipsa loquitur*. *See Benson*, 2005 WL 491536, at \*4.

## C.  LOSS OF CONSORTIUM

The last issue on appeal is Mrs. Greene's loss of consortium claim. A spouse's claim for loss of consortium is a separate claim from the injured party's claim. *Hunley v. Silver Furniture Mfg. Co.*, 38 S.W.3d 555, 557 (Tenn. 2001) (citing *Tuggle v. Allright Parking Sys.*, 922 S.W.2d 105, 108 (Tenn. 1996). However, a spouse's loss of consortium claim is derivative of the injured party's claim. *Hunley*, 38 S.W.3d at 557 (citing *Cross v. City of Memphis*, 20 S.W.3d 642, 645 (Tenn. 2000); *Tuggle*, 922 S.W.2d at 108; *Evans v. Wilson*, 776 S.W.2d 939 (Tenn. 1989)). As the trial court noted, Mrs. Greene's loss of consortium claim against TPA is derivative of Mr. Greene's negligence claim. Therefore, because TPA has successfully negated an essential element of the

negligence claim, the trial court was correct in holding that the loss of consortium claim fails as a matter of law.

## V. CONCLUSION

As a contractor providing security to the business owners, TPA did not have a special relationship with Club customers giving rise to a duty of care to protect customers from the actions of third parties that were beyond TPA's control. Despite this absence of a special relationship and the Club's indemnity for ordinary negligence, TPA still had a duty to refrain from gross negligence or willful misconduct. Mr. Greene's only claim that could possibly amount to gross negligence or willful misconduct was the allegation that a TPA guard accepted a bribe to allow a firearm into the Club. TPA successfully negated this allegation, leaving no genuine issue of material fact to demonstrate a breach of duty. In addition, Mrs. Greene's loss of consortium claim fails because it is derivative of Mr. Greene's negligence claim. Therefore, the judgment of the trial court is affirmed in its entirety. Costs on appeal are taxed to Appellants, Corey Greene and Caroline Greene. The case is remanded, pursuant to applicable law, for collection of costs assessed below.

_____
JOHN W. McCLARTY, JUDGE

12