FILED

01/06/2026

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 18, 2025 Session

## CEDRIC JONES v. KROGER LIMITED PARTNERSHIP I ET AL.

**Appeal from the Circuit Court for Davidson County**
No. 22C155     Thomas W. Brothers, Judge

---

### No. M2024-01417-COA-R3-CV

---

After slipping and falling on accumulated snow and ice in the parking lot of a grocery store, a man filed a premises liability lawsuit against the store, the owner of the parking lot, and the company hired to perform snow and ice removal services for the parking lot. The trial court granted summary judgment to all of the defendants because the court found that the proof at the summary judgment stage showed conclusively that reasonable minds could not differ that the man was at least fifty percent at fault for the injuries he alleged to have suffered. Discerning that the evidence shows that a dispute of material fact exists, we reverse the trial court's decision and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which W. NEAL MCBRAYER and JEFFREY USMAN, JJ., joined.

Alex P. White, Nashville, Tennessee, for the appellant, Cedric Jones.

Hayley E. Vos and Hallie P. Gillam, Nashville, Tennessee, for the appellees, Kroger Limited Partnership I and Jackson Village, LLC d/b/a Tobin Properties-Real Estate Group, Inc.

James R. Tomkins, Nashville, Tennessee, for the appellee, Music City Maintenance, Inc.

# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

On February 14, 2021, Middle Tennessee experienced a winter storm that left several inches of snow and ice in its wake. Approximately three days later, another winter storm passed through Middle Tennessee that left more snow and ice. Thus, between February 14 and 20, 2021, significant accumulations of snow and ice occurred throughout the area. On the morning of February 19, 2021, Cedric Jones needed to leave his home to purchase medicine for his girlfriend and formula and diapers for his infant child. He safely walked through the snow and ice accumulated at his home to reach his car that was parked in his driveway, and he drove to the pharmacy to purchase the medicine for his girlfriend. When Mr. Jones arrived at the pharmacy parking lot, he observed that the parking lot was covered in snow and ice; he later described it as "all messed up out there, ice and snow." Nevertheless, he traversed the pharmacy's parking lot without incident.

Once done at the pharmacy, Mr. Jones drove to the Kroger located at 4400 Lebanon Road in Hermitage, Tennessee to purchase the formula and diapers for his infant child. Kroger Limited Partnership I ("Kroger") operates the store located at 4400 Lebanon Road, but Jackson Village, LLC d/b/a Tobin Properties—Real Estate Group Inc. ("Jackson Village") owns the building and the parking lot at 4400 Lebanon Road. The parking lot measures approximately 235,000 square feet. Jackson Village contracted with Music City Maintenance, Inc. ("Music City") for the upkeep, care, and maintenance of the parking lot. Under this contract, Music City's duties included performing snow removal and salting services for the parking lot during the two-storm event that occurred between February 14 and 20, 2021.

When Mr. Jones arrived at the Kroger, snow had been scraped from the wide driving lane running parallel to the front of the store and from the slightly narrower lanes containing the parking spaces that run perpendicular to the storefront. Mounds of snow and slush ice covered several parking spaces as well as the ends of the lanes where the edges of the parking aisles abutted. Mr. Jones parked his vehicle in a parking space and walked into the store. He observed snow and ice in various areas of the parking lot. Thus, while walking from his vehicle to the store's entrance, he walked at a steady, moderate pace and used the lane that had been scraped. Mr. Jones walked into the store with no incident.

After completing his shopping, Mr. Jones exited the store and walked towards his vehicle, again walking at a steady, moderate pace. While walking towards his vehicle, he looked straight ahead, watching for any traffic in the parking lot, and Mr. Jones admitted that he was not distracted by traffic or anything else. Mr. Jones took a path slightly to the left of the path he used to enter the store and slipped and fell on ice near the end of the parking aisle where his vehicle was parked.

On January 27, 2022, Mr. Jones filed a complaint against Kroger, Jackson Village, and Music City (collectively "the Defendants"), alleging a claim for premises liability. The Defendants filed answers asserting comparative fault as an affirmative defense. After the parties engaged in discovery, the Defendants filed motions for summary judgment, arguing that the undisputed material facts established that Mr. Jones could not prove they breached a duty because the parking lot "had been scraped" to provide a safe path to enter and exit the store. They submitted a video recorded by Kroger's security camera showing, what the Defendants argued, was Mr. Jones safely entering the store via this path that was "clear" of snow and ice. The Defendants further argued that the undisputed facts showed that "no jury of 12 reasonable persons could reach any conclusion but that Mr. Jones bears 50% or more fault for his own fall and injuries" because he was negligent and inattentive when he exited the store. To support this argument, the Defendants relied on Mr. Jones's deposition testimony that he could have taken the same route he used to enter the store but "wasn't thinking" as he exited the store. They also relied on a second video recorded by Kroger's security camera that showed him walking back to his vehicle via a different path that took him towards a patch of accumulated snow and ice.

Mr. Jones filed a response opposing summary judgment because there were disputes of material facts. In particular, he contended that a dispute of material fact existed regarding whether the Defendants breached the applicable duty of care. In support of this argument, Mr. Jones relied upon the affidavit of an expert in landscaping and deicing and the deposition testimony of the owner of Music City showing that, during the relevant time period, the parking lot was not properly treated with deicing materials and that there was never a proper inspection of the snow and ice services completed by Music City.

After hearing arguments on the motions, the trial court entered an order granting summary judgment to the Defendants. In the order, the court stated that issues were raised "concerning the breach of duties by the Defendants," but the court found that "[s]now and ice are regular winter occurrences, which are common knowledge, and the duty of the property owner is to provide a safe means of ingress and egress, which it did in this instance." The court further found that reasonable minds could not differ that Mr. Jones was at least fifty percent at fault for his injuries due to the following:

> [Mr. Jones] for some unknown reason decided to avoid the clear wide path that was available to him, as he had used to enter the store, and instead he chose to walk across portions of the lot still containing snow and ice. He was not forced by the Defendants to take this route. Mr. Jones had an alternative clear route, which he chose not to use for unknown reasons, other than not thinking.

Mr. Jones appealed and presents three issues that we consolidate and restate as follows: whether the trial court erred in granting summary judgment.

STANDARD OF REVIEW

We review a trial court's summary judgment determination de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). This means that "we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.* In conducting our review, we must "'view the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving.'" *Shipley v. Williams*, 350 S.W.3d 527, 536 (Tenn. 2011) (quoting *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009)).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04. A disputed fact is material if it is determinative of the claim or defense at issue in the motion. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008) (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)). When a party moves for summary judgment but does not have the burden of proof at trial, the moving party must submit evidence either "affirmatively negating an essential element of the nonmoving party's claim" or "demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264. Once the moving party has satisfied this requirement, the nonmoving party "'may not rest upon the mere allegations or denials of [its] pleading.'" *Id.* at 265 (quoting TENN. R. CIV. P. 56.06). Rather, the nonmoving party must respond and produce affidavits, depositions, responses to interrogatories, or other discovery that "set forth specific facts showing that there is a genuine issue for trial." TENN. R. CIV. P. 56.06; *see also Rye*, 477 S.W.3d at 265. If the nonmoving party fails to respond in this way, "summary judgment, if appropriate, shall be entered against the [nonmoving] party." TENN. R. CIV. P. 56.06. If the moving party fails to show he or she is entitled to summary judgment, however, "'the non-movant's burden to produce either supporting affidavits or discovery materials is not triggered and the motion for summary judgment fails.'" *Martin*, 271 S.W.3d at 83 (quoting *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)).

When a trial court's findings are based on documentary evidence such as depositions, transcripts, and video recordings, this Court's "ability to assess credibility and to weigh the evidence is the same as the trial court's." *Kelly v. Kelly*, 445 S.W.3d 685, 693 (Tenn. 2014). Therefore, we "may draw [our] own conclusions with regard to the weight and credibility to be afforded that documentary evidence." *Id.*

ANALYSIS

I.    Duty

We begin with Mr. Jones's contention that the trial court erred in concluding that he was at least fifty percent at fault for his injuries because the court applied an incorrect duty of care when analyzing the Defendants' actions and then comparing those actions to his own. Specifically, Mr. Jones challenges the court's finding that the Defendants' conduct could not possibly be the cause of his injuries because they met their duty by providing him with "a safe means of ingress and egress."

Duty has been described as being "'a question of whether the defendant is under any obligation for the benefit of the particular plaintiff.'" *Dooley v Everett*, 805 S.W.2d 380, 384 (Tenn. Ct. App. 1990) (quoting W. Keeton, PROSSER AND KEETON ON THE LAW OF TORTS § 53 (5th ed. 1984)). Furthermore, "[t]he existence or nonexistence of a duty owed to the plaintiff by the defendant is entirely a question of law for the court." *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993). If a court determines that a defendant owed a duty, the question of whether the defendant breached that duty "'is one for the jury to determine based upon proof presented at trial.'" *Giggers*, 277 S.W.3d at 366 (quoting *McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 904 (Tenn. 1996)).

The Defendants do not dispute that they owed a duty of care to Mr. Jones. The parties' disagreement on this issue centers on the particular duty owed to him and whether it was breached. The general law in Tennessee for premises liability cases imposes a duty on those who own or control property to protect individuals on the property from unreasonable risks of harm. *Rice v. Sabir*, 979 S.W.2d 305, 308 (Tenn. 1998); *see also Bowman v. State*, 206 S.W.3d 467, 473 (Tenn. Ct. App. 2006). The Tennessee Supreme Court has explained the duty owed as follows:

> In a premises liability case, an owner or occupier of premises has a duty to exercise reasonable care with regard to social guests or business invitees on the premises. The duty includes the responsibility to remove or warn against latent or hidden dangerous conditions on the premises of which one was aware or should have been aware through the exercise of reasonable diligence.

*Rice*, 979 S.W.2d at 308 (footnote omitted). The Court further explained that "[t]he duty imposed on the premises owner or occupier, however, does not include the responsibility to remove or warn against 'conditions from which no unreasonable risk was to be anticipated, or from those which the occupier neither knew about nor could have discovered with reasonable care.'" *Id.* at 309 (quoting W. Page Keeton, PROSSER & KEETON ON TORTS, § 61 at 426 (5th ed. 1984)). Therefore, "a plaintiff in a premises liability case must generally prove that [a dangerous condition] existed for such a length of

time that the property owner knew, or in the exercise of ordinary care should have known, of its existence." *Bowman*, 206 S.W.3d at 473.

Tennessee courts have considered dangerous conditions created by natural accumulations of snow and ice "'to be among the normal hazards of life.'" *Id.* (quoting *Grizzell v. Foxx*, 348 S.W.2d 815, 817 (Tenn. 1960)). Premises owners, therefore, "are not required to keep their premises free of natural accumulations of snow and ice at all times." *Clifford v. Crye-Leike Com., Inc.*, 213 S.W.3d 849, 853 (Tenn. Ct. App. 2006). Furthermore, this Court has declined to impose a duty on owners or occupiers of property "to continuously remove snow or ice in the middle of an ongoing winter storm." *Id.*; *see also Simmons v. Russell*, No. 01A01-9709-CV-00467, 1998 WL 251751, at *3 (Tenn. Ct. App. May 20, 1998). The courts of this state have instead held that premises owners "are expected to take reasonable steps to remove snow and ice within a reasonable time after it has formed or accumulated." *Bowman*, 206 S.W.3d at 473-74 (citing *Grizzell*, 348 S.W.2d at 817).

In light of the foregoing principles, we agree with Mr. Jones's contention that the trial court mischaracterized the law when it determined that the Defendants did not breach a duty of care owed to Mr. Jones because "the duty of the property owner is to provide a safe means of ingress and egress, which [the Defendants] did in this instance." The trial court's determination of this issue should have considered whether the actions taken by the Defendants to remove accumulated snow and ice from the parking lot were reasonable and whether they took those actions within a reasonable time after the snow and ice accumulated. Whether such actions are reasonable depends upon, "'among other things, (1) the length of time the accumulation has been present, (2) the amount of the accumulation, (3) whether the accumulation could be, as a practical matter, removed, (4) the cost of removal, and (5) the foreseeability of injury.'" *Williams v. City of Jamestown*, No. M2015-00322-COA-R3-CV, 2016 WL 3574711, at *4 (Tenn. Ct. App. June 23, 2016) (quoting *Bowman*, 206 S.W.3d at 474).

The winter storm in this case was a two-event storm with the first snowfall occurring on February 14, 2021, and the second snowfall occurring approximately three days later. Nothing in the record indicates that snow continued to fall on the morning of the incident, February 19. The record also contains nothing regarding how many inches of snow and ice were left on the ground in the storm's wake, but the parties agree that it was a significant amount. The Defendants submitted proof that, by the morning of February 19, Music City had scraped the main driving lane running parallel to the storefront and the parking aisles running perpendicular to the storefront.[1] The parties presented no evidence regarding either

---

[1] It is unclear from the record what efforts, if any, the Defendants made to scrape the individual parking spaces on each parking aisle. From the Kroger video footage, however, it appears that many of the individual parking spaces contained snow and/or slush ice.

whether the Defendants, as a practical matter, could have removed accumulated snow and ice from the rest of the parking lot or how much that would have cost.

The Defendants and the trial court relied primarily on the video footage from Kroger's security camera that shows Mr. Jones safely entering the store via one of the scraped parking aisles. According to the Defendants, this evidence established that they took reasonable steps to remove the accumulated snow and ice because it showed that they provided a "clear and safe" path. Mr. Jones agrees that snow had been scraped from the driving lane and parking aisles, but he disputes that this satisfied the Defendants' duty to take reasonable steps to remove the accumulated snow and ice within a reasonable time after it accumulated. In particular, he argues that, although those areas of the parking lot had been scraped, they were not "clear and safe" because the Defendants were negligent in how they performed the scraping and in their application of deicing material to those areas.

The record contains the affidavit of David Schmutz, an expert with more than twenty-five years of experience clearing snow and ice from commercial properties. Mr. Schmutz opined that, to adequately address the accumulation of ice on the 235,000 square-foot parking lot, the Defendants needed to apply 117.5 bags of deicing material per day. Thus, between February 14 and 19, 2021, the Defendants should have applied 705 bags of deicing material to the parking lot. An invoice produced by Jackson Village detailing the amount of deicing material Music City applied to the parking lot during the relevant time period shows that the largest amount applied was fifty bags on February 16. Most of the days, Music City applied only forty or forty-five bags of deicing material. Between February 14 and 19, 2021, Music City applied a mere 250 bags of deicing material to the parking lot.

The record also contains deposition testimony from Cliff Reliford, the owner of Music City. He testified that deicing, scraping, and other ice and snow-related duties were performed at night, when visibility was naturally reduced. Music City's employees applied deicing materials to the parking lot with an electric spreader located on the back of a truck. Despite the reduced visibility, Music City's employees were not required to leave the vehicle to inspect the condition of the parking lot before or after completing deicing and scraping duties. Rather, Mr. Reliford, stated, Music City employees inspected the condition of the parking lot and whether deicing and scraping services were properly completed by simply viewing the parking lot from inside the vehicle. The only maintenance that Music City employees performed outside the truck was shoveling snow and spreading salt with a salt spreader on the sidewalks.

In regard to Kroger's and Jackson Village's actions, Mr. Jones presented internal documents produced by Kroger showing that, although Music City's snow and ice removal services had been provided, Kroger's inclement weather policies required store employees to monitor weather conditions and, when needed, to apply deicing materials to or shovel snow from sidewalks. Troy Gann, the assistant manager for the Kroger at 4400 Lebanon

Road when Mr. Jones fell, testified that he was unaware of these policies and admitted that the employees at the Kroger did not "do a walk-around of the parking lot when the store opens . . . when there has been a weather event." He also admitted that he had no contact with Music City about the condition of the parking lot or about when or how often Music City performed snow and ice removal services. Lastly, when Mr. Jones asked Jackson Village to produce a copy of any policies in place for monitoring the condition of the parking lot, Jackson Village responded, "None in this Defendant's possession."

After considering the foregoing evidence, the trial court found that a dispute of fact existed regarding whether the Defendants applied an adequate amount of deicing material to the parking lot, but the court determined that it was not "a material fact to the issues addressed [in the case]." We respectfully disagree. This evidence relates directly to whether the Defendants breached their duty "to take reasonable steps to remove snow and ice within a reasonable time after it has formed or accumulated." *Bowman*, 206 S.W.3d at 473-74 (citing *Grizzell*, 348 S.W.2d at 817). In other words, contrary to the trial court's finding, this evidence creates a question of fact regarding whether the path Mr. Jones used to enter the store was clear and safe. When the foregoing evidence and all reasonable inferences from it are viewed in the light most favorable to Mr. Jones as the non-moving party, we conclude that a genuine issue of material fact exists regarding whether the Defendants breached their duty of care. As will be discussed in the next section, this determination affects the trial court's comparative fault analysis.

II.     Comparative fault

Although a premises owner has a duty to use reasonable care, the premises owner is not an absolute insurer of a plaintiff's safety on the premises. *Easley v. Baker*, No. M2003-02752-COA-R3-CV, 2005 WL 697525, at *2 (Tenn. Ct. App. Mar. 24, 2005). A plaintiff has a coexisting duty "'to see what is in plain sight,'" *Vaughn v. DMC-Memphis, LLC*, No. W2019-00886-COA-R3-CV, 2021 WL 274761, at *7 (Tenn. Ct. App. Jan. 27, 2021) (quoting *Green v. Roberts*, 398 S.W.3d 172, 181 (Tenn. Ct. App. 2012)), and "'not to proceed into a known danger.'" *Id.* (quoting *Easley*, 2005 WL 697525, at *2). Thus, once it is established that a defendant owed a duty of care to the plaintiff, "'comparative fault come[s] into play.'" *Green*, 398 S.W.3d at 177 (quoting *Coln v. City of Savannah*, 966 S.W.2d 34, 42 (Tenn. 1998), *overruled on other grounds*).

Tennessee's system of modified comparative fault allows for allocation of liability "in proportion to degree of fault so long as the fault attributable to the plaintiff is less than that attributable to the defendant(s)." *Elrod v. Cont'l Apartments*, No. M2007-01117-COA-R3-CV, 2008 WL 425947, at *2 (Tenn. Ct. App. Feb. 13, 2008) (citing *McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992)). In other words, a "'plaintiff's damages are to be reduced in proportion to the percentage of the total negligence attributable to the plaintiff.'" *Vaughn*, 2021 WL 274761, at *14 (quoting *McIntyre*, 833 S.W.2d at 57). If a plaintiff is fifty percent or more at fault for his or her injuries, he or she cannot recover.

*See, e.g., Day v. Beaver Hollow L.P.*, 612 S.W.3d 32, 40 (Tenn. Ct. App. 2020). We have held that comparative fault "'is a question of fact within the jury's province, which should not lightly be invaded by the trial court.'" *Vaughn*, 2021 WL 274761, at *14 (quoting *LaRue v. 1817 Lake Inc.*, 966 S.W.2d 423, 427 (Tenn. Ct. App. 1997)). Thus, when considering a motion for summary judgment, "[t]he task of comparing and allocating fault may be taken from the jury only when it can be determined beyond question (or alternatively, when reasonable minds cannot differ) that the plaintiff's fault is equal to or greater than the defendant's." *Henley v. Amacher*, No. M1999-02799-COA-R3-CV, 2002 WL 100402, at *6 (Tenn. Ct. App. Jan. 28, 2002); *see also Lundell v. Hubbs*, No. E2019-02168-COA-R3-CV, 2020 WL 6867229, at *15 (Tenn. Ct. App. Nov. 23, 2020).

The Tennessee Supreme Court has held that the courts of this state should analyze an assumption of the risk issue "under the principles of comparative fault." *Perez v. McConkey*, 872 S.W.2d 897, 905 (Tenn. 1994). In particular,

> attention should be focused on whether a reasonably prudent person in the exercise of due care knew of the risk, or should have known of it, and thereafter confronted the risk; and whether such a person would have behaved in the manner in which the plaintiff acted in light of all the surrounding circumstances, including the confronted risk.

*Id.*

A. Surveillance videos

Here, the trial court concluded that summary judgment was appropriate for the following reasons:

> Despite the questions of fact raised about the amount of deicing materials used in the lot, it is abundantly clear to the Court that a clear path of ingress and egress was provided to the Plaintiff Cedric Jones in the parking lot, which was in fact used by Mr. Jones to enter the Kroger, but he chose not to utilize the same safe pathway when exiting the store and walking toward his car, and instead proceeded through an area containing snow and ice, and that he fell when he encountered this condition. . . . The Court finds that reasonable minds would not differ that the Plaintiff Cedric Jones for some unknown reason decided to avoid the clear wide path that was available to him, as he had used to enter the store, and instead he chose to walk across portions of the lot still containing snow and ice. He was not forced by the Defendants to take this route. Mr. Jones had an alternative clear route, which he chose not to use for unknown reasons, other than not thinking. The Court finds this one of those rare instances where the factual proof at the summary judgment stage shows conclusively that reasonable minds could not differ that Mr. Jones is

at least 50% responsible for the injuries he alleges to have suffered in this fall by encountering snow and ice in the parking lot for no explainable reason.

The factual proof that the trial court considered as conclusive that Mr. Jones was at least fifty percent at fault was the video footage recorded by Kroger's security camera of him entering and exiting the store. Indeed, the trial court found that "review of the video[s] is crucially important to the determination of the issues addressed here."

Mr. Jones asserts that the trial court's reliance on these specific videos[2] to determine that the Defendants were entitled to summary judgment was improper because the quality of the videos was so poor that the importance or weight to be given to them was properly a question for the jury. After reviewing these videos, we must agree with Mr. Jones's contention. Both videos are low-resolution, jump in and out of focus, and seem to include moments of time lag. The videos are not the original security camera footage itself. Rather, they appear to be secondhand recordings of the actual security footage, as the edges of a computer monitor are clearly visible. The focus noticeably moves and sways as if the images are being played on a computer monitor while being recorded on a handheld camera or cell phone.

The foregoing issues are further compounded by the vantage point of the store's security camera. The security camera pointed down and away from where it was mounted. Thus, the images at the bottom of the screen are closest to the camera's location, the images in the middle of the screen are farther away, and the images at the top of the screen are the farthest away. Due to the low resolution of the videos, the finer details of the images at the top of the screen and farthest from the camera are not very discernible. Though more discernible, the quality of the images appearing at the bottom of the screen also leaves much to be desired.

In the video footage of Mr. Jones entering and exiting the store, he is seen in the middle of the top-right quadrant of the screen—an area with the least clarity. Nevertheless, in the video of Mr. Jones entering the store, he can be seen walking at a steady, moderate pace in the middle of the parking aisle closest to his vehicle. The viewer can also see that snow has been scraped from the main driving lane in front of the store and from the parking aisles running perpendicular to the storefront, including the one Mr. Jones used to enter the store. Mounds of snow are visible at the ends of parking aisles and in several parking spaces and are noticeably different in size. Patches of ice, however, are not visible, nor is it discernible how much, if any, deicing material has been applied. All the viewer can really discern about the scraped areas of the parking lot, including the parking aisle Mr. Jones used to enter the store, is that some areas appear shiny or wet, while other parts do not. The

---

[2] Mr. Jones clarifies in his appellate brief that his argument here is specifically addressed to the trial court's reliance on these videos. He does not contend that there could never be a situation in which a trial court could find a video dispositive for the resolution of a defendant's motion for summary judgment.

shiny spots may have been patches of ice, or they may not have been. The poor quality of this video makes it impossible to know for sure. Thus, contrary to the Defendants' contention and the trial court's finding, this video footage shows that the Defendants scraped snow from areas of the parking lot, but it does not clearly show that they provided a "clear and safe path" of ingress and egress.

The lack of a discernible "clear and safe path" is especially important when considering the video footage of Mr. Jones exiting the store. The trial court's findings seem to imply that this video footage definitively shows that, when exiting the store, Mr. Jones, for "no explainable reason," chose to walk back to his vehicle via a completely different path that clearly was not safe because anyone paying attention would have seen that it was covered with snow and ice. The video footage of Mr. Jones exiting the store, however, does not support the trial court's finding. This video has the same quality issues discussed above that limit what the viewer can discern regarding whether and to what extent the Defendants provided a "clear and safe path" and whether Mr. Jones completely ignored such a path on his way out of the store.

In the second video, Mr. Jones can again be seen walking at a steady, moderate pace as he exited the store and then taking a different path back to his vehicle. Though the trial court found that Mr. Jones inexplicably "decided to avoid the clear wide path" he safely used to enter the store, this video footage shows that the path he took back to his vehicle is only slightly to the left of that path. Furthermore, from this video footage, there is no discernible difference in the appearance of the path he took to enter the store and the path slightly to the left of it that he used to exit the store. In other words, if the path he used to enter the store was "clear and safe," it is unclear from this video what the boundaries of the path were. A reasonable mind, therefore, could view this video and conclude that it does not show Mr. Jones, for "unknown reasons, other than not thinking," choosing "to avoid the clear wide path that was available to him." Rather, a reasonable mind could conclude that the video shows him taking a different path back to his car, a path that was only slightly to the left of and that looked the same as the path he used to enter the store, and that he did not abandon caution and "proceed into a known danger" as he exited the store. Instead, one could conclude that Mr. Jones reasonably proceeded to take that path because it looked, perhaps deceptively, safe and deiced.

We also note that, though the viewer can see that the path Mr. Jones used to exit the store brought him closer to a mound of snow at the end of the parking aisle, this footage does not clearly show him walking directly into the mound of snow and then slipping and falling. Rather, it appears that he slipped and fell on a scraped section of the parking lot near, but before reaching, the visible mound of snow. This fact is especially important when considered in conjunction with the dispute of material fact regarding the amount of deicing material the Defendants applied to the parking lot. A reasonable mind could view this video and conclude that Mr. Jones slipped and fell on a patch of ice on the scraped

portion of the parking lot because the Defendants chose to spread the deicing material too thinly to remedy the accumulated snow and ice adequately.

Given the foregoing issues with the surveillance videos, we conclude that the trial court erred in finding that this evidence "shows conclusively that reasonable minds could not differ that Mr. Jones is at least 50% responsible for the injuries he alleges to have suffered in this fall by encountering snow and ice in the parking lot for no explainable reason."

### B. *Elrod v. Continental Apartments* and *Sanders v. CB Richard Ellis, Inc.*

Despite the issues with the quality of the surveillance videos, the Defendants contend that they are still entitled to summary judgment because prior decisions of this Court with similar facts to those here establish that Mr. Jones was at least fifty percent at fault. In particular, the Defendants rely on *Elrod v. Continental Apartments*, No. M2007-01117-COA-R3-CV, 2008 WL 425947 (Tenn. Ct. App. Feb. 13, 2008), and *Sanders v. CB Richard Ellis, Inc.*, No. W2007-02805-COA-R3-CV, 2008 WL 4366124 (Tenn. Ct. App. Sept. 22, 2008). Their reliance on these two cases is misplaced, however.

In *Elrod*, the plaintiff sued an apartment complex for injuries sustained in a slip and fall. *Elrod*, 2008 WL 425947, at *1. On the second day of a winter storm, the plaintiff traversed icy roads to deliver a security deposit to the apartment complex so she could reserve an apartment for herself and a friend. *Id.* Notably, snow and ice were still falling as the plaintiff drove to the apartment complex. *Id.* The apartment complex, therefore, had not yet "salted or shoveled the parking lot." *Id.* at *3. When getting out of her car, the plaintiff observed that snow and ice were "all around" and proceeded to "'tiptoe' carefully" through the parking lot. *Id.* at *1. On the way back to her vehicle, however, "for reasons that defy logic, . . . she moved in a 'little trot like' manner on pavement she knew was slippery due to ice and snow" and fell and fractured her ankle. *Id.* at *3. The trial court granted summary judgment to the apartment complex because reasonable minds could not differ that the plaintiff was more at fault than the apartment complex. *Id.* at *1. This Court affirmed, concluding that, because the plaintiff "abandoned caution by 'trotting' over snow and ice . . . reasonable minds could not differ that her fault was greater than any of the defendants." *Id.* at *3.

The present case is substantially different because the record contains no evidence indicating that snow or ice continued to fall on the morning that Mr. Jones fell, meaning that, unlike in *Elrod*, the Defendants' duty to take reasonable steps to remove accumulated snow and ice had been triggered. The Defendants had scraped several sections of the parking lot and applied some deicing material to it before Mr. Jones arrived at the Kroger that morning, but, unlike in *Elrod*, issues exist regarding whether the Defendants breached the applicable duty of care by applying an insufficient amount of deicing material. Due to the Defendants' efforts to scrape and apply some deicing materials, Mr. Jones, unlike the

- 12 -

plaintiff in *Elrod*, did not encounter a completely untreated parking lot that any reasonable person would have understood required a high level of caution to traverse. The scraping and deicing efforts the Defendants made, even if insufficient, could have led Mr. Jones to believe the scraped portions of the parking lot did not require the same level of caution as that in *Elrod* because the scraped areas looked deceptively safe and deiced. Furthermore, unlike the plaintiff in *Elrod*, the surveillance videos, though of poor quality, show that Mr. Jones walked at a steady, moderate pace both when he entered and exited the store rather than in a "trot like" manner.

In *Sanders*, the undisputed facts showed that the plaintiff drove nearly thirty miles "to do some business at Regions Bank" despite knowing there had been a winter storm in the area that day. *Sanders*, 2008 WL 4366124, at *1. When he arrived at the bank, the plaintiff "noticed that the parking lot looked 'real icy,' and 'like it had not been salted.'" *Id.* at *1. Although the bank had opened its drive-through window and made efforts to make the drive-through window safely accessible to its patrons, the plaintiff chose to park his car on an icy slope and proceeded to walk across the untreated, icy parking lot. *Id.* He slipped and fell on the icy slope and then sued the defendants for negligence. *Id.* The trial court awarded summary judgment to the defendant because it concluded that the undisputed facts established that the plaintiff was at least fifty percent at fault for his injuries. *Id.* at *2. This Court affirmed, concluding that the undisputed facts showed that the plaintiff knew that the parking lot was icy and appeared not to have been salted, but he unreasonably chose to abandon caution and walk across the dangerous parking lot despite the fact that the bank had provided a safe alternative—the drive-through window. *Id.* at *5.

Here, unlike in *Sanders*, a dispute of material fact exists regarding whether the Defendants provided a safe alternative because the path into the store may not have been safe. If the Defendants applied an inadequate amount of deicing material, the scraped areas of the parking lot may have appeared safe when they were not. Thus, questions of fact remain as to whether Mr. Jones acted unreasonably by taking a path back to his vehicle that was only slightly to the left of, and similar in appearance to, the one he used to enter the store.

We acknowledge that Mr. Jones testified that he was aware of the snow and ice in the Kroger parking lot when he arrived at the store that morning and that he appreciated the dangerous condition created by the snow and ice. We further acknowledge that he admitted that he took a slightly different path out of the store than he had taken in, because he "wasn't thinking at the time." Thus, a jury may find that he bears some or all of the responsibility for his injuries, but we are not persuaded by the Defendants' argument that *Elrod* and *Sanders* establish conclusively that Mr. Jones is at least fifty percent at fault.

Because genuine issues of material fact exist regarding whether the Defendants breached the duty of care owed to Mr. Jones and what percentage of fault, if any, should

be allocated to the Defendants and to Mr. Jones, we conclude that the trial court erred in granting summary judgment to the Defendants.

CONCLUSION

The judgment of the trial court is reversed, and the matter is remanded for further proceedings consistent with this opinion. Costs of this appeal are assessed against the appellees, Kroger Limited Partnership I, Jackson Village, LLC d/b/a Tobin Properties-Real Estate Group, Inc., and Music City Maintenance Inc., for which execution may issue if necessary.


/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE